Edward HILL, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–00–00172–CR.

Court of Appeals of Texas, Tyler.

May 9, 2001.

Rehearing Overruled June 12, 2001.

Discretionary Review Denied March 27, 2002.

Donald S. Davidson, Tyler, for appellant.

Edward J. Marty, Tyler, for state.

Panel consisted of DAVIS, C.J., WORTHEN, J., and RAMEY, Retired, C.J., sitting by assignment.

DAVIS, Justice.

Appellant Edward Hill was certified to stand trial as an adult for the offense of capital murder committed when he was a juvenile. After the trial court overruled his motion to suppress his videotaped confession, Appellant pleaded guilty to capital murder and was sentenced to life in prison. In one issue, Appellant complains of error when the trial court overruled his motion to suppress his videotaped confession. We reverse and remand for a new trial.

## THE ISSUES

In one multifarious issue, Appellant argues that the trial court erred in overruling his motion to suppress his videotaped confession for the following reasons: (1) that following his arrest he was not transported "without unnecessary delay," to a(2) "designated juvenile processing center" in violation of section 52.02(a) of the Texas Family Code,[1] (3) that his parents were not promptly notified of his arrest in violation of section 52.02(b), and (4) that his confession was obtained after he had already indicated he did not wish to waive his rights to counsel and against self incrimination in violation of sections 51.09, 51.095 and 51.10, as well as the Fifth and Sixth Amendments to the Constitution of the United States. For purposes of this opinion, we shall treat each of Appellant's four arguments as separate issues.

The State correspondingly responds that the issues of (1) transporting without unnecessary delay, to a(2) designated juvenile processing center were waived and not preserved for appeal, (3) Appellant's moth-er was promptly notified, and (4) Appellant voluntarily, knowingly and intelligently waived his constitutional rights to counsel and against self-incrimination.

## BACKGROUND

### Arrest and Interrogation

On August 18, 1999 at approximately 9:10 a.m., Detective John Ragland, an investigator with the major crimes unit of the Tyler Police Department, was notified of a robbery and shooting at a Tyler convenience store. When he arrived at the crime scene around 9:25 a.m., Appellant, a sixteen-year-old juvenile, was already in the custody of one of several police officers who had given chase to Appellant and other suspects.[2] Appellant, wearing blood-splattered clothing, was apprehended in the yard of a residence near the convenience store after a foot pursuit. Appellant was placed in a patrol car at the scene until he could be transported to the police station. He remained in the patrol car for about forty-six minutes before being transported to the Tyler police station.

Appellant arrived at the Tyler police station at approximately 10:16 a.m. Appellant was processed through technical services where he was fingerprinted and photographed. At approximately 12:35 p.m., a magistrate arrived to give Appellant his statutory *Miranda* warnings. The exchange between the magistrate and Appellant was recorded on videotape and is set forth verbatim as follows:

MAGISTRATE: Edward, what's your birthday?

APPELLANT: August 27, '82.

MAGISTRATE: Edward, I am going to administer to you at this time your stat-

---

1. All future references will be to the Family Code, unless otherwise specified. TEX. FAM. CODE ANN. (Vernon Supp.2001).

2. Appellant was apparently the only juvenile involved.

utory warnings as a juvenile. We are here present at the Tyler Police Department. You are charged by law enforcement with the offense of capital murder, which is a capital felony. You have the right to remain silent, not make any statement at all, and any statement that you make, may be used in evidence against you. You have the right to have an attorney present to advise you either prior to or during any questioning and during any questioning. If you are unable to employ an attorney, you have a right to have an attorney appointed as counsel with you with you (sic) prior to or during any interviews with peace officers or attorneys representing the State. You have the right to terminate the interview at any time. Present in the room at this time is [sic] just you and I; is that right, Edward?

APPELLANT: Yes, sir.

MAGISTRATE: Law enforcement officers have left when I began reading you the warnings. Have you listened carefully to and do you understand each of the above rights as they were read and explained to you by me?

APPELLANT: Yes, sir.

MAGISTRATE: Do you have any questions regarding any of these rights?

APPELLANT: No, sir.

MAGISTRATE: And do you at this time wish to voluntarily waive these rights?

APPELLANT: *No, sir.*

MAGISTRATE: Excuse me?

APPELLANT: *No, sir.*

[At this point, the magistrate appears to write on and initial the warnings form]

MAGISTRATE: It is now 12:38 p.m. I'll ask you to sign the warnings where it says "signature of a juvenile."

[Appellant signs the warning form as requested]

Mr. Hill, do you understand what it means to waive any of these rights?

APPELLANT: No, sir.

MAGISTRATE: 'Waive' means, do you wish to at this time give up your right to remain silent and not make any statement at all? In other words, are you desiring to make a statement at this time.

[Appellant nods his head in the affirmative.]

MAGISTRATE: You don't understand what waive means, do you?

[Appellant shakes head in the negative.]

MAGISTRATE: Waive means that you give up a right, one of the rights that I just explained to you.

APPELLANT: No. [The videotape seems to show Appellant shaking his head in the negative about waiving his rights.]

MAGISTRATE: Now, I'm going to ask you—do you understand what waive means now?

APPELLANT: Yes, sir.

MAGISTRATE: I'm going to ask you, do you wish to waive your right to remain silent?

APPELLANT: *No, sir.*

MAGISTRATE: So do you want to remain silent at this time?

APPELLANT: *Yes, sir.*

MAGISTRATE: Do you wish to waive or give up your right to have an attorney present to advise you either prior to or during any questioning?

APPELLANT: *No, sir.*

MAGISTRATE: Do you understand you have the right to terminate this interview at any time?

APPELLANT: Yes, sir.

MAGISTRATE: Do you understand if you're unable to employ an attorney, you have the right to have an attorney appointed to counsel with you prior to or during any interviews with peace officers or attorneys representing the State.

APPELLANT: Yes, sir.

MAGISTRATE: Very well. That concludes the statutory warnings. **My understanding from our conversation is, Edward, you are or you are not wanting to give a statement at this time?**

APPELLANT: What do you mean by "statement"?

MAGISTRATE: If you want to give up your right to remain silent, your right to have an attorney present with you and go ahead and give a statement and in the interview, police officers, who are not in the room at this time, will come in here and interview you.

APPELLANT: Yes, sir.

MAGISTRATE: Do you want them to do that, or do you want to not do that?

APPELLANT: I want to do that.

MAGISTRATE: Okay. Now, in order for you to do that, you will have to give up your right to remain silent and not make any statement at all.

APPELLANT: Yes, sir.

MAGISTRATE: Do you want to give up that right?

APPELLANT: Yes, sir.

MAGISTRATE: Okay. Then you will have to give up your right to have an attorney present to advise you either prior to or during any questioning. Do you want to give up that right—

APPELLANT: Yes, sir.

MAGISTRATE:—and make a statement at this time?

APPELLANT: Yes, sir.

MAGISTRATE: I am making an amendment to the statutory warning of juvenile by magistrate. I previously under the, answer, yes or no, put "no". I am scratching that putting my initials next to it, and I am putting in place, "yes". Okay. So where I put, yes, there, you understand that you listened to and now you understand the above rights, that they were read and explained to you, and that you have asked questions, and you and I have discussed these rights and you understand them, and you voluntarily wish to give up those rights and proceed with an interview; is that correct?

[While the magistrate was saying this, he was amending the warnings form.]

APPELLANT: Yes, sir.

MAGISTRATE: Okay. That does conclude the statutory warnings by magistrate, and at this time I am going to ask the police officers to come back into the room and take your statement. Do you understand that, Edward?

APPELLANT: Yes, sir.

. . .

(Emphasis added).

At this point, the officers returned and Appellant gave an incriminating statement on videotape which concluded at 1:04 p.m. In his statement, Appellant confessed to shooting Buford Hinton during the robbery of the convenience store. After the videotaped statement was concluded, the magistrate administered the magistrate's juvenile verification and completed the magistrate's certification form at 1:11 p.m. Appellant's mother was first contacted at 1:45 p.m. by Sergeant Barrentine of the Tyler Police Department.

### The Suppression Hearing

After the juvenile court waived jurisdiction, Appellant was indicted in the district

court to stand trial as an adult for capital murder. The trial court held a hearing on Appellant's motion to suppress his video-taped confession which was carried along over several days. At the hearing, Detective Ragland testified that when he arrived at the crime scene there were four suspects and six separate "crime scenes" which had to be processed: 1) the store, 2) the location where the gun was recovered, 3) the North Spring Street location where some of the suspects were apprehended, 4) the location where Appellant was apprehended, 5) the hospital where the victim, Buford Hinton, had been transported and died, and 6) the police station where the suspects were eventually transported. Blood-splattered clothing had to be recovered from the persons of three of the suspects, and atomic absorption tests to detect gunshot residue were performed on their hands. In excess of ninety items of physical and forensic evidence were collected and secured at the various crime scenes.

Detective Ragland testified it was necessary to keep the suspects separate, and Appellant was placed in a patrol car at the scene to prevent further flight attempts and for his own safety and comfort until he could be transported to the police station. In the middle of August it was extremely hot outside, and the patrol car was air-conditioned. Appellant waited in the patrol car for about forty-six minutes before being transported to the police station. After he arrived at the Tyler Police Department, Appellant spent some time in the Technical Services Unit where he was fingerprinted and photographed. According to Detective Ragland, it would not be unusual for a suspect to spend hours in the Technical Services Unit when he is one of several suspects.

The magistrate also testified at the suppression hearing. When asked why he did not "stop the interview" when Appellant indicated that he did not wish to waive his Miranda rights, the magistrate replied that he was not "interviewing" Appellant and continued to make inquiries of Appellant because, as a magistrate administering warnings, he was charged not only with explaining the rights to Appellant, but also with verifying that Appellant understood his rights. He maintained he was not concerned with whether Appellant gave a statement or not—only with whether Appellant understood his rights.

After the administration of the magistrate's warnings to Appellant, Detective Ragland and Detective Frank Brewer took a videotaped statement from Appellant in which he confessed to shooting Buford Hinton during the robbery of the convenience store where Hinton was working. Detective Ragland testified that while he was making the statement, Appellant did not appear to be "high" or intoxicated nor did Appellant claim to be otherwise impaired. He said that Appellant was "cognitive" and gave appropriate responses to the questions asked.

Detective Ragland testified that he personally did not attempt to contact Appellant's parents at any time on August 18, 1999. It is unclear from the record whether Detective Brewer attempted to contact Appellant's parents earlier. Detective Brewer did not testify.[3] Detective Ragland further stated that the investigation was not completed before Appellant's mother was notified.

---

**3.** Detective Ragland testified he thought Detective Brewer was in Kosovo at the time of the hearing.

Ruby Hill, Appellant's mother, testified that she was first contacted by telephone by Sergeant Barrentine of the Tyler Police Department at 1:45 p.m. on August 18, 1999, and was informed that her son was in custody and charged with murder. Mrs. Hill maintained she was home all morning and her phone did not ring before that call; she said she had no other calls on her voice mail or on her "Caller ID" on that day. Mrs. Hill was not aware of anyone involved in the case attempting to contact her at her place of employment on August 18, 1999. Mrs. Hill related that on the date of the offense, she was living apart from Appellant's father, Otis Hill, who did not have a telephone.

The trial court overruled Appellant's motion to suppress, and Appellant pleaded guilty to capital murder and was sentenced to life in prison. Appellant brings this appeal challenging the trial court's overruling of his motion to suppress.

### STANDARD OF REVIEW

■■■■ At a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *See Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App.1996); *In re L.R.*, 975 S.W.2d 656, 658 (Tex.App.—San Antonio 1998, no pet.). Ordinarily, we view the evidence in the light most favorable to the trial court's ruling and afford almost total deference to its findings if they are supported by the record, especially when the trial court's fact findings are based upon an evaluation of credibility and demeanor. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997); *In re A.D.D.*, 974 S.W.2d 299, 305 (Tex.App.—San Antonio 1998, no pet.). We afford the same amount of deference to the trial court's rulings on "mixed questions of law and fact," if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. However, when the resolution of the suppression issue does not turn upon an evaluation of credibility or demeanor, we review *de novo* the trial court's determination of the applicable law, as well as its application of the law to the facts. *See Guzman*, 955 S.W.2d at 89; *In re A.D.D.*, 974 S.W.2d at 305. In the instant case, the facts are undisputed. Therefore, our review is *de novo*.

### TRANSPORTATION TO DESIGNATED JUVENILE PROCESSING CENTER

In Appellant's first two issues, he contends that he was in custody in violation of Family Code sections 52.02(a) and 52.025, and, therefore, the court should have suppressed his confession. Section 52.02(a) provides that a person taking a child into custody must release the child to proper parties or take the child to one of several proscribed places "without unnecessary delay." *See* TEX. FAM.CODE ANN. § 52.02(a). One such proscribed place is a juvenile processing office designated under section 52.025. *See* TEX. FAM.CODE ANN. § 52.025.

**Unnecessary Delay**

■■■ Appellant contends that because he was not transported to the police station "without unnecessary delay" as required by section 52.02(a) of the Family Code, the trial court erred in not suppressing his confession. The State argues that this issue is waived. Appellant first raised this issue in a supplemental memorandum of law in support of his motion to suppress, apparently in response to Exhibit "A" of the State's memorandum of law filed May 5, 2000. Exhibit "A" inexplicably was not made part of the Clerk's Record on appeal. However, when the State was allowed to reopen the evidence on the motion to suppress, Detective Ragland testified to the

contents of the affidavit, and, thus, the State itself injected the issue into the hearing. Under these circumstances, we make no determination as to whether the issue is waived but address the issue as if it were not waived.

■ Determination of what amounts to an "unnecessary delay" must be made on a case-by-case basis. *Contreras v. State*, 998 S.W.2d 656, 660 (Tex.App.—Amarillo 1999, pet. granted). The facts in the instant case are very different from the facts in *Contreras* where the Amarillo court held that a fifty-minute wait in a patrol car was an unnecessary delay. After stabbing her stepfather, Contreras called 911 herself, waited outside for the police to arrive, and immediately admitted to the responding officer what she had done. There was no indication of multiple suspects or multiple crime scenes. There was no evidence, such as the victim's blood, which had to be collected from the juvenile's person.

In this case, Appellant fled the scene of the shooting and was captured after a pursuit. There were multiple suspects who had to be kept separate, and the police were not certain that all of the actors had been apprehended. There were multiple crime scenes in the vicinity where Appellant was apprehended. Appellant was wearing blood-splattered clothing which had to be collected from his person, and, perhaps most importantly, atomic absorption tests had to be performed on Appellant's hands before any gunshot residue was removed inadvertently.

We hold that under the facts in the instant case, Appellant's wait in the patrol car was not an "unnecessary delay" in violation of section 52.02(a) of the Family Code.

### Designated Juvenile Processing Center

■ Appellant contends that the Tyler police station was not a designated juvenile processing office under section 52.025 of the Family Code, and the trial court therefore erred in not suppressing his confession. The State again argues that this issue is waived. We agree.

■ In order to preserve a complaint concerning the admission of evidence for appellate review, the complaining party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling he desired the court to make and obtained a ruling. TEX.R.APP. P. 33.1. A motion which states one legal theory cannot be used to support a different legal theory on appeal. *Broxton v. State*, 909 S.W.2d 912, 918 (Tex.Crim.App.1995). A review of the record reveals that although Appellant urged several grounds for suppression of his confession, neither his written motion and legal memoranda, nor the evidence adduced at the hearing included a motion for suppression on the basis that the confession was obtained while Appellant was detained at a place not designated a juvenile processing center under section 52.025.

There is scant evidence in the record of the suppression hearing that the Tyler Police Department—or any part of it—is a designated juvenile processing center. However, the State had no burden to establish that fact because Appellant did not include such contention in his motion to suppress. *See Contreras*, 998 S.W.2d at 659 (holding it is the juvenile's burden to raise noncompliance with such statutory requirements.)

We hold that Appellant waived the issue of whether the Tyler Police Department was a designated juvenile processing office under sections 52.02(a) and 52.025 of the

Family Code.[4] *See Darden v. State*, 629 S.W.2d 46 (Tex.Crim.App. [Panel Op.] 1982); *Leno v. State*, 934 S.W.2d 421 (Tex. App.—Waco 1996), *pet. dism'd improvidently granted*, 952 S.W.2d 860 (Tex.Crim. App.1997); *In the Matter of T.R.S.*, 931 S.W.2d 756 (Tex.App.—Waco 1996, no pet.).

### PARENTAL NOTIFICATION

■ Appellant contends that his confession should have been suppressed based on the failure of the officers having him in custody to promptly contact his parents as required by section 52.02(b) of the Family Code. Section 52.02(b)(1) provides that "a person taking a child into custody **shall promptly** give notice of the reason for taking the child into custody, to ... the child's parent, guardian, or custodian ...." (emphasis added). TEX. FAM.CODE ANN. § 52.02(b)(1). Therefore, we must determine whether the parental notification in this case complied with section 52.02(b)(1).

There are few cases that specifically address the issue of prompt parental notification under section 52.02(b). In *Gonzales v.*

*State*, 9 S.W.3d 267 (Tex.App.—Houston [1st Dist.] 1999, pet. granted) the court held that section 52.02(b)(1) was not satisfied where the evidence at the hearing on the juvenile's motion to suppress did not show that the juvenile's parents had been notified at all. In *State v. Simpson*, 51 S.W.3d 633 (Tex.App.—Tyler 2000), this Court affirmed the trial court's suppression of a juvenile's confession pursuant to section 52.02(b) when the juvenile's mother was not notified until the Sunday evening following his arrest at 11:00 a.m. on the preceding Friday. *In the Matter of C.R.*, 995 S.W.2d 778 (Tex.App.—Austin 1999, pet. denied), a juvenile was picked up for questioning as a witness by police between 7:30 p.m. and 9:30 p.m. The juvenile became a suspect when he implicated himself around 11:00 p.m. His mother was not contacted until around 1:00 a.m. and then only told that her son was "helping the officers 'on a job.' " She was not notified he was in custody until four hours later at 5:00 a.m. The court of appeals reversed, finding this was not prompt notification under section 52.02(b).

In the instant case, Appellant was arrested shortly before 9:25 a.m., but his

4. We are, of course, aware of the trend in the appellate courts to apply the additional analyses of *Marin v. State*, 851 S.W.2d 275, 280 (Tex.Crim.App.1993), *overruled on other grounds by, Matchett v. State*, 941 S.W.2d 922 (Tex.Crim.App.1996), when determining waiver of a juvenile's statutory rights. *See In re C.O.S.*, 988 S.W.2d 760 (Tex.1999). Under *Marin* there are three categories of rights. The first set of rights are those that are considered so fundamental that implementation of these requirements is not optional and cannot, therefore, be waived or forfeited by the parties. *Marin*, 851 S.W.2d at 280. The second category of rights are those that must be implemented by the system unless expressly waived. *Id.*, at 278–79. The third set of rights are those that the trial court has no duty to enforce unless requested, and the law of procedural default applies. *See id.* at 279. This analysis has been explicitly endorsed and

extended to the juvenile offender context. *See In re C.O.S.*, 988 S.W.2d 760 (holding that before the 1997 amendment to section 54.03 of the Family Code, a juvenile's rights under that statute must be implemented unless expressly waived); *Childs v. State*, 21 S.W.3d 631 (Tex.App.—Houston [14th Dist.] 2000, pet. ref'd) (holding that a juvenile's rights under section 51.095 of the Family Code must be implemented unless expressly waived).

Neither the Supreme Court nor the Court of Criminal Appeals has yet held that *Marin* analysis is required in section 52.02(a) cases, but out of an abundance of caution, we take judicial notice of the fact that the "Technical Services" area, the "Interview Room and Investigative Services Area," and the "Gang Youth Investigators Office" of the Tyler Police Department were designated juvenile processing offices under an order signed by Judge Floyd T. Getz on July 19, 1999.

mother was not contacted until 1:45 p.m., 4 hours and 20 minutes later. Detective Ragland never attempted to contact anyone, testifying he was busy working the crime scenes, collecting evidence, and taking Appellant's statement. It is unclear from the record whether or not Detective Brewer had attempted to contact Appellant's parents earlier, although Detective Ragland "believed" he had. Appellant's mother was not contacted until she was reached by Sergeant Barrentine at 1:45 p.m. While this four hour and twenty minute delay standing alone might not warrant reversal pursuant to section 52.02(b), the impact of the delay was enhanced by the fact that the juvenile was in the process of deciding whether or not to waive important constitutional rights. It is also noteworthy that his mother was reached by telephone on the very first attempt immediately after Appellant's confession had been obtained following his on-again off-again attempts to claim his constitutional rights. There was scant direct evidence in the record of any efforts to contact her or anyone else until after the confession was obtained. Under these circumstances we hold this was not prompt notification under section 52.02(b) of the Family Code. We, however, do not rely on the parental notification issue alone in to reversing the case. We turn now to the issue of Appellant's purported waiver of his constitutional rights to remain silent and to counsel.

### WAIVER OF CONSTITUTIONAL RIGHTS

In his fourth issue, Appellant contends that his constitutional rights to remain silent and to counsel were violated when the magistrate continued his interview after Appellant made an unequivocal statement that he did not wish to waive his rights. The State responds that because of Appellant's demeanor and "contradictory" answers, the magistrate did not believe

Appellant understood what waived meant and he was entitled to continue to discuss the meaning of the term until he was satisfied Appellant intelligently made a decision.

Even when an accused does not have the added protections afforded a juvenile under the Texas Family Code, the constitutional right to counsel and to remain silent have been zealously guarded by a long line of cases. Attempts to secure incriminating statements from an accused are among the pretrial phases of a criminal prosecution to which the supreme court has extended Sixth Amendment protection. *See Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985). The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). The Fifth Amendment privilege is available under circumstances such as these and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. *Id.* at 467, 86 S.Ct. 1602. If an accused indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. *Id.* at 474, 86 S.Ct. 1602. "At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id.* "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* "The record must show, or there must be an allegation and evidence which

show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." *Id.* at 475, 86 S.Ct. 1602, *citing Carnley v. Cochran,* 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962).

■■■■ The determination of whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forego his rights to remain silent and have the assistance of counsel. *Fare v. Michael C.,* 442 U.S. 707, 724–25, 99 S.Ct. 2560, 2571–72, 61 L.Ed.2d 197 (1979). When a defendant v. expresses his desire to deal with the police through counsel only, he is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with police. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); *Hunt v. State,* 632 S.W.2d 640, 641 (Tex.App.—Dallas 1982, pet. ref'd).

■■■■ When an accused exercises his constitutional right to remain silent and to an attorney, if an interrogation continues without the presence of an attorney and a statement is taken, the burden is on the government to demonstrate that the defendant v. knowingly and intelligently waived his privilege against self-incrimination and his right to counsel. *Holloway v. State,* 780 S.W.2d 787, 789 (Tex.Crim.App.1989). If, however, subsequent interrogation is initiated by law enforcement, no waiver of counsel (no matter how apparently knowingly and voluntary) is valid. *Id.* at 789–90; *see also Hearne v. State,* 534 S.W.2d 703 (Tex.Crim.App.1976); *Cooper v. State,* 961 S.W.2d 222, 225 (Tex.App.—Houston

[1st Dist.] 1997, pet. ref'd), *citing Minnick v. Mississippi,* 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489 (1990). If an individual indicates in any manner at any time before or during questioning that he wishes to remain silent, the interrogation must cease. *Id., citing Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627.

In the case before us we must evaluate the exchange between Appellant and the magistrate in light of these principles. The magistrate's interview can be broken down into three segments. The first occurred when Appellant and the magistrate entered the room and began their conversation. The magistrate read Appellant the statutory warnings and asked if he wished to waive his rights. Appellant clearly and distinctly indicated that he did not wish to waive them. The magistrate asked Appellant to repeat his answer and Appellant reiterated his refusal to waive his rights, whereupon the magistrate indicated a "no" response to the statement on the form: "At this time, I fully understand all my rights as they have been explained to me, and I voluntarily wish to waive them." The magistrate then asked Appellant to sign the waiver form on which the magistrate had indicated a waiver refusal which Appellant did.

According to his testimony at the suppression hearing, the magistrate decided to inquire whether Appellant understood what the term "waive" meant. Appellant answered, "No, sir" and the magistrate proceeded with an explanation of the term "waive." During this explanation, Appellant, while shaking his head in the negative, said "No," again indicating a desire not to waive his rights. When he was finished, the magistrate asked Appellant if he now understood what the term "waive" meant and Appellant answered, "Yes, sir." The magistrate then asked Appellant if he wished to "waive or give up" his right to

remain silent. Appellant again answered, "No, sir." The magistrate then asked affirmatively if Appellant wished to remain silent and was told, "Yes, sir." This response was followed by Appellant being asked if he wished to "waive or give up" his right to have an attorney present to advise him. Again, Appellant responded, "No, sir." By this time, Appellant had unequivocally invoked his rights six times.

The magistrate then stated, "Very well. That concludes the statutory warnings." At this point, the interview should have ended. The magistrate had admirably done his job, and the Appellant had steadfastly declined to waive his constitutional rights. However, for whatever reason, the magistrate asked the proverbial one question too many. The magistrate continued "My understanding from our conversation is, Edward, you are or you are not wanting to give a statement at this time?" This was an improper inquiry. It is not the magistrate's role or responsibility under the Family Code to find out whether an accused wishes to "give a statement." It is a magistrate's responsibility to ascertain if an accused juvenile wishes to waive his constitutional rights. The phrasing of this question, after six unequivocal responses invoking his constitutional rights, unfortunately opened a Pandora's box of further explanation of what Appellant needed to do in order to give a statement: he needed to waive his rights to remain silent and to counsel. Explaining what one needs to do in order to give a statement is not the purpose of the magistrate's warning provisions for juveniles under the Family Code.

Appellant unequivocally invoked his rights under the Fifth and Sixth Amendments at least six times.[5] *See, e.g., Watson v. State,* 762 S.W.2d 591, 600 (Tex. Crim.App.1988) (defendant's right to remain silent not scrupulously honored after the defendant refused to answer questions); *Stone v. State,* 612 S.W.2d 542 (Tex.Crim.App.1981) (state failed to meet its burden of proving that a defendant's incriminating response to questioning by district attorney was given after knowing and voluntary waiver of right to counsel); *Faulder v. State,* 611 S.W.2d 630 (Tex. Crim.App.1979) (request by defendant that he be allowed a couple of days to get matters straight in his mind was an invocation of the right to remain silent and law enforcement officers' failure to honor such request rendered statement inadmissible); *Ochoa v. State,* 573 S.W.2d 796 (Tex.Crim. App.1978) (statement by the accused that he thought he ought to talk to an attorney before answering questions or signing anything was sufficient to invoke the right to counsel even though the request was not pressed); *see also Mayes v. State,* 8 S.W.3d 354, 361 (Tex.App.—Amarillo 1999, no pet.) (statement by defendant that she was "not talking" and was "going to shut up" as well as "I have to get one for both of us" when told she could talk to lawyer was an unambiguous invocation of the right to remain silent and to counsel); *Sontag v. State,* 841 S.W.2d 889 (Tex. App.—Corpus Christi 1992, pet. ref'd) (admission of the audio portion of a videotape made after a motorist invoked his right to counsel was reversible error).

5. Those six times were as follows: (1) when the warnings were initially given and Appellant said "No, sir" when asked if he wanted to give up his rights, (2) when he was asked to repeat himself, (3) when, as the magistrate explained the meaning of "waiver" and Appellant said, "No" when the magistrate mentioned giving up his rights, (4) when the magistrate asked him if he wished to give up his right to remain silent a second time, (5) followed by asking him if he wanted to remain silent and Appellant said, "Yes," and (6) when the magistrate asked Appellant if he wished to give up his right to an attorney and he responded, "No."

Although Appellant clearly and unequivocally asserted his right to remain silent and his right to counsel, even after the magistrate had taken time to explain the meaning of waiver, the interview did not cease nor was an attorney provided. After the magistrate had stated that the warnings were concluded, he continued to interview Appellant regarding the giving of a statement. In this regard, the magistrate's action constituted a re-institution of the interview with Appellant. Appellant did not initiate the contact to reopen the discussion, the magistrate did. The interview should have stopped at the first indication by Appellant that he wished to invoke his rights. Accordingly, his right to remain silent was not scrupulously honored, rendering his subsequent confession inadmissible. *Edwards v. Arizona*, 451 U.S. at 486–87, 101 S.Ct. at 1886. Appellant's issue is sustained.[6]

## CONCLUSION

We must carefully comply with the mandatory provisions the legislature has chosen to enact for the protection of juvenile rights, as well as those constitutional rights guaranteed to all citizens regardless of age. As the Texas Court of Criminal Appeals has recently stated:

> The Legislature has set forth very specific actions which a law enforcement officer must take when arresting a juvenile. We are aware of the disturbing increase in juvenile crime in our state, and we are sympathetic to law enforcement's efforts to deal with violent juvenile offenders. Nevertheless, we must not ignore the Legislature's mandatory provisions regarding the arrest of juveniles. We informed the citizenry, a dec-

ade ago in a unanimous opinion, of the Legislature's clear intent to reduce an officer's impact on a juvenile in custody. Today we remind police officers of the Family Code's strict requirements.

*Le v. State*, 993 S.W.2d 650, 655 (Tex.Crim. App.1999).

Having sustained Appellant's issue, we *reverse* the judgment of the trial court and *remand* this cause for a new trial.

GRIFFITH, J., not participating.

---

6. We note that in *Le,* the Court of Criminal Appeals remanded to the appellate court to conduct a harm analysis in light of the remaining evidence offered at the juvenile's tri-al. In the present case, Appellant pled guilty; thus, we are unable to conduct a harm analysis.