Tomas URIAS, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–01–00355–CR.

Court of Appeals of Texas, El Paso.

Jan. 16, 2003.

**580**

David Greenhaw, Odessa, for Appellant.

John W. Smith, Dist. Atty., for State.

Before Panel No. 5 McCLURE, CHEW, JJ., and PRESLAR, C.J. (Ret.).

## OPINION

ANN CRAWFORD McCLURE, Justice.

In April 2000, Tomas Urias was arrested and charged with possession of marijuana. While detained on these charges, he was questioned by an officer of the Ector County Sheriff's office. During one of the investigative interviews, Appellant was asked about a homicide in which he had been a primary suspect since 1996 and he ultimately confessed to the crime. He was charged with the murder of Adrian Arenivas and pled not guilty. His motion to suppress the confession was denied by the trial court. A jury found him guilty and assessed a punishment of 48 years, to be served in the Institutional Division of the Texas Department of Criminal Justice. On appeal, Appellant contends his confession was involuntary.

## FACTUAL SUMMARY

The following facts are essentially uncontroverted. Appellant worked for Raul Gardea, a known drug dealer.[1] He lost a load or two and ended up owing Gardea some $60,000. Afraid for his own life and that of his family, Appellant shot Adrian Arevinas and stole his Jeep. He gave Gardea the Jeep in partial payment of the money owed. The victim's body was found in Ector County, Texas in September 1996; his Jeep was found near Ojinaga, Mexico.

Appellant and Billy Campbell were linked to the homicide and stolen vehicle. Campbell was located shortly thereafter. However, Appellant could not be found at the time and it was determined that he had fled to Mexico. His whereabouts were unknown until he was arrested on marijuana charges and placed in the Ector County Detention Center in late April 2000.

Appellant was indicted for possession of marijuana (more than five pounds, but less than fifty pounds). Jason Leach was appointed as his counsel. Appellant told the narcotics officers that he wanted to talk about some unrelated matters that could possibly be beneficial to the amount of time he served. Leach and Appellant both called the Texas Department of Public Safety, Narcotic Services, and spoke with Sergeant Investigator Mario Tinajero about setting up an interview for that purpose.[2] Leach told Tinajero that he wanted to be present during any questioning of his client.

While at the jail on May 10, 2000, Sergeant Tinajero ran into Carl Rogers, a homicide investigator with the Ector County Sheriff's Department, and told him he planned to talk with Appellant regard-

---

1. The record contains oblique references to Gardea's association with the Mexican mafia. At the time of trial, he was incarcerated in a federal penitentiary.

2. Appellant had provided information to Tinajero when he was jailed on a previous drug charge in June 1996. He received a favorable plea bargain which reduced the time served from five years to nine months.

ing the drug investigation. Rogers recognized the name and indicated he wished to question Appellant about a homicide investigation. The next day, Tinajero and Rogers visited Appellant at the jail. Leach was not notified and did not attend. Rogers was told at some point that Appellant was represented by Leach, but he made no effort to contact him. Tinajero testified that he called Leach afterward and apologized for forgetting to notify him of the meeting.[3]

Tinajero and Rogers brought a tape recorder to the interview. Appellant gave Tinajero information about a counterfeit money operation in Albuquerque, New Mexico and other drug related information. He hoped that the information he provided on the drugs, guns, or counterfeit money operations would help him receive a more favorable plea offer. Tinajero questioned him for about thirty minutes but did not record the conversation. Rogers then conducted the remainder of the interview. He told Appellant that he was investigating a homicide that had occurred around August 1996. Rogers showed him a picture of the victim and proceeded to question Appellant for about twenty-five minutes. Rogers then started recording the interview, stated the names of the persons present, and read Appellant his *Miranda*[4] warnings. Appellant stated that he understood his rights. The following exchange ensued:

> ROGERS: Okay. And understanding what those rights are, are you willing to waive those rights at this time? And talk with us about this investigation? Understanding that, that you can stop the interview at this time?

APPELLANT: I want to stop. I want to stop right now.

The tape recorder was turned off for about eight minutes and then Rogers began recording again.

At this point, the versions of the story change. At the suppression hearing, Tinajero did not recall that Appellant had asked to stop the interview. When presented with the transcript of the tape recording, he testified as follows:

> Q: Now then, it says, 'I want to stop right now,' and the time is 11:28. Now then, we have restarted this voluntary statement at it is 11:36. Does that sound about right, that y'all turned the tape off for about eight minutes?
>
> A: I guess that's correct, yes.
>
> Q: Well, as best as your recollection is, eight to ten minutes—
>
> A: Yes, sir.
>
> Q: —you turned the tape off. What did you talk about?
>
> A: To tell you the truth, I don't actually recall exactly what we talked about because I am not a homicide investigator so I never directed any questions to Mr. Urias about the homicide. I never really actually spoke to him about the homicide once Mr. Rogers took over.
>
> Q: Did you make any statements to him that if he would talk about this, you would help him like you did in Pecos?
>
> A: No sir. I never related anything about helping him on the homicide like we did in Pecos.
>
> Q: Did you ever mention anything at all about 'helping him like we did in Pecos' concerning anything during that eight minutes?

---

3. Tinajero told Rogers about the appointed counsel and testified that he knew Appellant "had an attorney, but I forgot to call the attorney."

4. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 723 (1966).

A: No, sir, I didn't. I don't recall. Carl Rogers was handling the interview at that time and, like I said, I am not a homicide investigator so I didn't even know what to ask him about a homicide.

Q: I am not asking you what you asked. What did you hear? What was said by Mr. Rogers?

A: I don't recall.

Q: So we have got eight minutes that you completely forgot what happened?

A: I know that at one time I went to get him a drink. I offered and it could have been at that time. When we initially began the interview, I asked him if he wanted something to drink and he declined. Later on he said he would take that drink now. I stepped out to go get him a Coke and brought it back.

Q: And that's when the tape wasn't going?

A: That's possible. I don't really recall. I didn't take any notes regarding that statement so it is possible that that's when that—

Q: So we will just have to listen to the tape real close and we can hear the door on when you came and went; right?

A: Well, no. Like you said a minute ago, that was—if that's when—you asked if that is when the tape was stopped and I presume it was when I stepped out to get him a drink.

Q: So your testimony to the Court for those eight minutes is you don't recall anything that was said?

A: That's correct.

Rogers didn't remember much either:

Q: Okay. So after that, how come you questioned him anymore [sic]?

A: Well, at the time that he advised me that he wanted to stop, I did stop the tape, and that's what the transcript reflects. At the time that I stopped the tape, I believe I asked him something to the effect if that was it, did he want to stop. He was hesitant. He obviously was in a position where he was wanting to think. That is what it appeared to me.

Q: Well, but he said, 'I want to stop.' That's what he articulated to you?

A: And we stopped at that time.

Q: All right. And so why don't you take your recorder and leave and put him back in his cell like he has requested?

A: At a further point in time, he advised that he wanted to continue.

Q: Well, he has also said he wants to stop, did he not?

A: Yes, sir.

Q: And proper procedure is when a man wants to quit questioning, you quit; correct?

A: And we did, yes, sir.

Q: All right. And so you can put him back in the cell and forget it; right?

A: Yes, sir.

Q: But you didn't do that?

A: No, sir.

Q: All right. And it is your testimony that it is him wanting to—

A: I don't recall what was said during that period of time, but he indicated that he did, in fact, want to think about it, and subsequent to that he said he wanted to make the statement.

Q: Okay. You don't recall what he said or you said in that eight minutes?

A: I am telling you generally what transpired during that period of time and that's basically what I recall of it.

Q: Well, do you remember any statements that were made in those eight minutes?

A: I do not remember any verbatim statements that were made in those eight minutes, no, sir.

Appellant testified that after he told Rogers he wanted to stop, the officer continued to question him:

Q: And did you tell him that you wanted to stop the questioning?

A: Yes, I did, sir.

Q: And did he then turn off the recorder?

A: Yes, he did, sir.

Q: Did he quit questioning you?

A: Yes, sir. On the matter of the murder?

Q: Yeah.

A: Yes, sir.

Q: Then what did he do?

A: He started talking to me about—first I stopped and sat a minute quiet. And then they asked—they offered me the drink again and then I said yes. Mr. Mario did leave and went to pick up—went and brought me the drink. Then Mr. Carl Rogers was talking to me that it would be okay if I would cooperate as well as I was cooperating with Mr. Mario and that he would be able to help—he would be wanting to help me out as much as he could in this other—in any way he could for this matter.

Q: So he promised to help you in this case?

A: Yes, sir. That everything was going to be okay if I would help him out—

Q: And that's when you—

A: —in this case, the murder case.

Q: Okay. And that's whenever you made your statement after that?

A: Yes, sir.

. . .

Q: Whenever you said you wanted to quit talking to them, did they leave you alone or did they keep staying in there with you? What did they do?

A: They—No. Mr. Carl Rogers, like I said, he was being friendly and telling me that he would—it would be nice for him to help me—to help him out in this case, the murder case, and he would be willing to cooperate as much as he could to help me out.

Q: So he did not—he continued to question you as well?

A: Yes, sir.

Q: After you had told him to stop?

A: Yes, sir.

Rogers himself admitted as much at trial:

Q: Well, at that point in time he had indicated to you, I don't want to be interviewed anymore; correct?

A: Mr. Greenhaw, I did not understand him to say that he did not want to be interviewed further. He said he wanted to stop and I stopped the tape.

Q: 'I want to stop. I want to stop right now.' He said that?

A: Yes, sir, he did.

Q: You stopped the tape?

A: That's correct.

Q: But you didn't leave, did you?

A: No, sir.

Q: And then there was a discussion off the tape, wasn't there?

A: Yes, sir.

. . .

Q: Why did you turn that tape off? I mean, it is going. Why didn't you leave when he exercised his Miranda rights?

A: I turned the tape off because he said he wanted to stop.

Q: Why didn't you leave?

A: He didn't indicate that he wanted to leave.

Q: Was he free to leave?

A: He was free to be returned to the jail.

Q: He was in jail; right?

A: Yes, sir. Yes, sir.

Q: But you were free to leave, were you not?

A: Yes, sir. We were free to leave.

Q: But you didn't?

A: No, sir.

Q: So you continued to talk with him after he said, 'I want to stop'?

A: What I—I continued to talk to him.

Q: Did you—

A: I continued to talk to him.

At trial, Tinajero claimed that neither he nor Rogers interrogated Appellant during the ten minute time lapse, but he admitted leaving the room to get a soft drink. He had returned by the time the recorder was turned on the second time. He later testified that "maybe Mr. Rogers said he—something about being at the right place at the wrong time, something like that."

Q: So you thought he wanted a breather and then the interrogation continued even though he had said 'stop'?

A: No, we did not interrogate him after he said 'stop.' We did not interrogate him about anything after he said he wanted to stop.

Q: I thought you really didn't have any recollection of those eight minutes?

A: I basically don't. And I know that at the suppression hearing I had forgotten part of the—what happened. But, you know, I remember a lot of it now of what happened and I have talked with Mr. Rogers since then and—

Rogers testified that he began recording again because Appellant agreed to continue with the interview. During the second taping sequence, Appellant stated that he did not need his rights read to him again. He then proceeded to tell Rogers that he and his accomplice had shot the victim in the head so that they could steal his Jeep. They then drove the Jeep to Mexico to be sold, so that a drug-related debt could be paid off.

## STANDARD OF REVIEW

With regard to motions to suppress, we review the trial court's findings of fact under an abuse of discretion standard and will not disturb those findings as long as they have support in the record. *Villarreal v. State,* 935 S.W.2d 134, 138 (Tex.Crim.App.1996); *Whitten v. State,* 828 S.W.2d 817, 820 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd); *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App. 1990). The reviewing court must give almost total deference to the trial court's determination of historical facts. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App. 1997); *Gordon v. State,* 4 S.W.3d 32, 35 (Tex.App.-El Paso 1999, no pet.). In contrast, the trial court's conclusions of law and the application of those principles to the facts of the case are to be reviewed *de novo.* *State v. Ross,* 32 S.W.3d 853, 856 (Tex.Crim.App.2000). The State correctly points out that because there were no explicit findings of historical facts by the trial court in this case, the evidence must be viewed in a light most favorable to the trial court's ruling. *Carmouche v. State,* 10 S.W.3d 323, 327 (Tex.Crim.App.2000). Where, as here, the suppression issue has been consensually relitigated at trial, we review the entire record, not just the record made at the suppression hearing, to determine whether the confession was voluntary. *See Rachal v. State,* 917 S.W.2d 799, 809 (Tex.Crim.App.1996). Moreover, the trial court's ruling should be upheld if it is correct on any theory of law applicable to the case. *Ross,* 32 S.W.3d at 855–56.

## VOLUNTARINESS OF CONFESSION

In his sole point of error, Appellant claims that the trial court erred in

denying the motion to suppress because his confession was obtained in violation of his *Miranda* rights. If a suspect indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. *Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1626–27, 16 L.Ed.2d at 723; *Mayes v. State,* 8 S.W.3d 354, 358 (Tex.App.-Amarillo 1999, no pet.). Thereafter, the invocation of that right by the suspect must be "scrupulously honored." *Maestas v. State,* 987 S.W.2d 59, 61–62 (Tex.Crim.App.1999), *quoting Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *Mayes,* 8 S.W.3d at 358. This does not mean that no further questioning can ever occur, but rather that there must be an end to the proceeding sufficient to indicate that the police respected the suspect's request. *Mayes,* 8 S.W.3d at 358. If a statement is governed by *Miranda* (i.e. the suspect is in custody), then a failure to cut off questioning after a suspect invokes his right to remain silent violates his rights and renders any subsequently obtained statements inadmissible. *Mosley,* 423 U.S. 96, 113, 96 S.Ct. 321, 331, 46 L.Ed.2d 313; *Sterling v. State,* 830 S.W.2d 114, 116 (Tex. Crim.App.1992), *cert. denied,* 506 U.S. 1035, 113 S.Ct. 816, 121 L.Ed.2d 688 (1992); *Dowthitt v. State,* 931 S.W.2d 244, 257 (Tex.Crim.App.1996). A law enforcement officer may not continue to question the suspect until the officer succeeds in persuading the suspect to change his mind and talk. *Hearne v. State,* 534 S.W.2d 703, 705 (Tex.Crim.App.1976); *Dowthitt,* 931 S.W.2d at 257. Article 38.22 prohibits the admission of a written or oral statement made as a result of custodial interrogation by an accused in a criminal proceeding without the warnings required by *Miranda.* TEX.CODE CRIM.PROC.ANN. art. 38.22, §§ 2, 3 (Vernon 1979 and Vernon Pamphlet 2003); *Holland v. State,* 770 S.W.2d 56 (Tex.App.-Austin 1989), *aff'd,* 802 S.W.2d 696 (Tex.Crim.App.1991).

Prior to *Miranda,* the admissibility of a suspect's confession was evaluated under a voluntariness test. *Dickerson v. U.S.,* 530 U.S. 428, 432–33, 120 S.Ct. 2326, 2330, 147 L.Ed.2d 405 (2000). Two constitutional bases emerged for determining voluntariness: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment. *Id.* The United States Supreme Court tracked the history in *Dickerson,* noting that "for the middle third of the 20th century our cases based the rule against admitting coerced confessions primarily, if not exclusively, on notions of due process." *Id.* The test was ultimately refined into an inquiry that examined whether a defendant's will was overborne by the circumstances surrounding the giving of a confession. *Dickerson,* 530 U.S. at 434, 120 S.Ct. at 2331, *citing Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The due process test considers "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.*

■ With the advent of *Miranda,* however, the focus shifted to the Fifth Amendment and its application to custodial interrogation. "[C]oercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment ... not to be compelled to incriminate himself.'" *Dickerson,* 530 U.S. at 435, 120 S.Ct. at 2331, *citing Miranda,* 384 U.S. at 439, 86 S.Ct. at 1602.

Two years after *Miranda* was decided, Congress enacted 18 U.S.C. § 3501, which in effect, designated voluntariness as the touchstone of admissibility, omitted a warning requirement, and instructed the

trial courts to consider a nonexclusive list of factors relevant to the circumstances of a confession. *Dickerson,* 530 U.S. at 436, 120 S.Ct. at 2332. Concluding that the legislative intent was to overrule *Miranda,* the *Dickerson* court considered whether the *Miranda* decision announced a constitutional rule or simply regulated evidence in the absence of congressional direction. *Dickerson,* 530 U.S. at 436–37, 120 S.Ct. at 2332–33. The court itself acknowledged its prior decisions in which it referred to the *Miranda* warnings as prophylactic and not themselves rights protected by the Constitution. *Dickerson,* 530 U.S. at 437–38, 120 S.Ct. at 2333. Two of these decisions were of significance to an opinion by the Texas Court of Criminal Appeals. *See Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Both of these cases involved the failure to give the *Miranda* warnings rather than the failure to scrupulously honor the warnings given. Nevertheless, in *Baker v. State,* 956 S.W.2d 19 (Tex.Crim.App.1997), the court determined that "[t]he failure to scrupulously honor a suspect's invocation of his right to remain silent by continuing questioning is not necessarily coercive." *Id.* at 23. This holding was premised on the concept that statements taken in violation of *Miranda* are not obtained in violation of law. *Baker,* 956 S.W.2d at 24. The United States Supreme Court retreated from that tenet in *Dickerson* and abandoned the totality of the circumstances test.

> The disadvantage of the *Miranda* rule is that statements which may be by no means involuntary, made by a defendant who is aware of his 'rights,' may nonetheless be excluded and a guilty defendant go free as a result. But experience suggests that the totality-of-the-circumstances test which § 3501 seeks to revive is more difficult than *Miranda* for

law enforcement officers to conform to, and for courts to apply in a consistent manner.

. . .

> In sum, we conclude that *Miranda* announced a constitutional rule that Congress may not supersede legislatively. Following the rule of *stare decisis,* we decline to overrule *Miranda* ourselves.

530 U.S. at 444, 120 S.Ct. at 2336.

The Court of Criminal Appeals has now embraced *Dickerson.* In *McCarthy v. State,* 65 S.W.3d 47 (Tex.Crim.App.2001), the court returned to the "bright and firm constitutional rule" that applies to all suspects and law enforcement officers. *Id.* at 52, *citing Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). While *McCarthy* involved the Fifth Amendment right to counsel, we believe it should apply equally to the Fifth Amendment right against self-incrimination. Our sister courts have agreed. *See Hill v. State,* 78 S.W.3d 374 (Tex.App.-Tyler 2001, pet. denied); *Mayes v. State,* 8 S.W.3d 354 (Tex.App.-Amarillo 1999, no pet.).

In *Hill,* a juvenile was certified to stand trial as an adult for the offense of capital murder. The magistrate who administered the *Miranda* warnings decided to inquire whether Hill understood the definition of "waive." The opinion details the exchange:

> According to his testimony at the suppression hearing, the magistrate decided to inquire whether Appellant understood what the term 'waive' meant. Appellant answered, 'No, sir' and the magistrate proceeded with an explanation of the term 'waive.' During this explanation, Appellant, while shaking his head in the negative, said 'No,' again indicating a desire not to waive his rights. When he

was finished, the magistrate asked Appellant if he now understood what the term 'waive' meant and Appellant answered, 'Yes, sir.' The magistrate then asked Appellant if he wished to 'waive or give up' his right to remain silent. Appellant again answered, 'No, sir.' The magistrate then asked affirmatively if Appellant wished to remain silent and was told, 'Yes, sir.' This response was followed by Appellant being asked if he wished to 'waive or give up' his right to have an attorney present to advise him. Again, Appellant responded, 'No, sir.' By this time, Appellant had unequivocally invoked his rights six times.

The magistrate then stated, 'Very well. That concludes the statutory warnings.' At this point, the interview should have ended.

*Hill,* 78 S.W.3d at 385–86. The court noted that the magistrate then asked the proverbial one question too many, inquiring whether the juvenile wanted to give a statement. Finding this to be an improper inquiry, the court concluded:

> After the magistrate had stated that the warnings were concluded, he continued to interview Appellant regarding the giving of a statement. In this regard, the magistrate's action constituted a re-institution of the interview with Appellant. Appellant did not initiate the contact to reopen the discussion, the magistrate did. The interview should have stopped at the first indication by Appellant that he wished to invoke his rights. Accordingly, his right to remain silent was not scrupulously honored, rendering his subsequent confession inadmissible.

*Id.* at 387.

Similarly, in *Mayes,* as one officer was admonishing the defendant of her rights, she interrupted and said, "I'm going to stop talking." *Mayes,* 8 S.W.3d at 356. Despite this pronouncement, the officer continued with his comments and questions. About four minutes later, Mayes again declared, "I'm going to shut up. I'm not going to say another goddamned thing." The detectives neither paused nor ended the proceeding. Rather, they continued as if uninterrupted, and finally persuaded Mayes to tell the story which they had been waiting to hear. *Id.*

Here, the officers stopped the recording once Appellant declared that he wanted to stop, but they admittedly did not terminate the interview. While the officers parsed words as to whether Appellant was "interrogated" at that point, the form the statements took is irrelevant. *Mayes,* 8 S.W.3d at 360 (holding that regardless of whether the officers uttered declaratory rather than interrogatory statements, the officers were pressing the defendant for information about the crime and their actions constituted interrogation). We conclude that the trial court erred in admitting Appellant's statement.

## HARM ANALYSIS

Having found error, we must necessarily proceed to a harm analysis. Where, as here, the appellate record in a criminal case reveals constitutional error, we must reverse a judgment of conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction. Tex.R.App.P. 44.2(a); *McCarthy,* 65 S.W.3d at 52. This decision is not determined solely on the basis of whether there was sufficient evidence, independent of the defendant's inadmissible statement, for a reasonable jury to reach the same conclusion. *Id.* at 55, *citing Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). Instead, we must review whether the admission of the statement contributed to the verdict of guilt, regardless of whether there is independent evidence which is otherwise sufficient to sustain the verdict. *Id.*

Nor are we to focus on the propriety of the outcome of the trial. *Wesbrook v. State,* 29 S.W.3d 103, 119 (Tex.Crim. App.2000). We should calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence. *Id.* at 119. A defendant's statement, especially a statement implicating him in the commission of the charged offense, is unlike any other evidence that can be admitted against the defendant. *Arizona v. Fulminante,* 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991):

> [A] defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.

*See id.* at 296, 111 S.Ct. at 1257.

While we recognize that at the time Appellant was interrogated, the *Dickerson* and *McCarthy* opinions had not issued, we must nevertheless conclude that the source and nature of the error here was a blatant violation of Appellant's Fourth Amendment rights by law enforcement officers. Declaring the error harmless would not encourage law enforcement to follow the bright line constitutional mandates in the future. Furthermore, the State certainly emphasized and relied upon the confession throughout the trial. Indeed, it offered no other evidence linking Appellant to the crime. Consequently, it is highly probable that the jury relied on the confession when reaching the verdict. "If the jury believes that a defendant has admitted the crime, it doubtless will be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case. Apart, perhaps, from a videotape of the crime, one would have difficulty finding evidence more damaging to a criminal defendant's plea of innocence." *Fulminante,* 499 U.S. at 313, 111 S.Ct. at 1266 (Kennedy, J., concurring). Regardless of whether there was, apart from Appellant's statement, sufficient evidence to support the conviction, we find it impossible to say there is no reasonable likelihood that the State's use of Appellant's statement materially affected the jury's deliberations. *See McCarthy,* 65 S.W.3d at 56; *Wesbrook,* 29 S.W.3d at 119. Accordingly, we sustain Appellant's sole point of error. We reverse the judgment of the trial court and remand this cause to that court for a new trial.

PRESLAR, C.J. (Ret.)(sitting by assignment).