COURT
OF APPEALS

                                                    EIGHTH
DISTRICT OF TEXAS

                                                               EL
PASO, TEXAS

 

                                                                              )     

TOMAS URIAS,                                                  )                    No. 
08-01-00355-CR

                                                                              )

Appellant,                          )                             Appeal from

                                                                              )     

v.                                                                           )                      358th District Court

                                                                              )

THE STATE
OF TEXAS,                                     )                    of Ector County, Texas

                                                                              )

Appellee.                           )                           (TC# D-28,524)

 

O
P I N I O N

 

In
April 2000, Tomas Urias was arrested and charged with
possession of marijuana.  While detained
on these charges, he was questioned by an officer of the Ector County Sheriff=s office.  During one of the investigative interviews,
Appellant was asked about a homicide in which he had been a primary suspect
since 1996 and he ultimately confessed to the crime.  He was charged with the murder of Adrian Arenivas and pled not guilty.  His motion to suppress the confession was
denied by the trial court.  A jury found
him guilty and assessed a punishment of 48 years, to be served in the
Institutional Division of the Texas Department of Criminal Justice.  On appeal, Appellant  contends his confession was
involuntary.

FACTUAL SUMMARY








The
following facts are essentially uncontroverted.  Appellant worked for Raul Gardea,
a known drug dealer.[1]  He lost a load or two and ended up owing Gardea some $60,000. 
Afraid for his own life and that of his family, Appellant shot Adrian Arevinas and stole his Jeep.  He gave Gardea the
Jeep in partial payment of the money owed. 
The victim=s body
was found in Ector County, Texas in September 1996; his Jeep was found near Ojinaga, Mexico.  

Appellant
and Billy Campbell were linked to the homicide and stolen vehicle.  Campbell was located shortly thereafter.  However, Appellant  could not be found at the time and it
was determined that he had fled to Mexico. 
His whereabouts were unknown until he was arrested on marijuana charges
and placed in the Ector County Detention Center in late April 2000.

Appellant
was indicted for possession of marijuana (more than five pounds, but less than
fifty pounds).  Jason Leach was appointed
as his counsel.  Appellant told the
narcotics officers that he wanted to talk about some unrelated matters that
could possibly be beneficial to the amount of time he served.  Leach and Appellant both called the Texas
Department of Public Safety, Narcotic Services, and spoke with Sergeant
Investigator Mario Tinajero about setting up an
interview for that purpose.[2]  Leach told Tinajero
that he wanted to be present during any questioning of his client.  








While
at the jail on May 10, 2000, Sergeant Tinajero ran into
Carl Rogers, a homicide investigator with the Ector County Sheriff=s Department, and told him he planned
to talk with Appellant regarding the drug investigation.   Rogers recognized the name and indicated he
wished to question Appellant about a homicide investigation.  The next day, Tinajero
and Rogers visited Appellant at the jail. 
Leach was not notified and did not attend.  Rogers was told at some point that Appellant
was represented by Leach, but he made no effort to contact him.  Tinajero testified
that he called Leach afterward and apologized for forgetting to notify him of
the meeting.[3]

Tinajero and Rogers brought a tape recorder to the
interview.  Appellant gave Tinajero information about a counterfeit money operation in
Albuquerque, New Mexico and other drug related information.  He hoped that the information he provided on
the drugs, guns, or counterfeit money operations would help him receive a more
favorable plea offer.  Tinajero questioned him for about thirty minutes but did
not record the conversation.  Rogers then
conducted the remainder of the interview. 
He told Appellant that he was investigating a homicide that had occurred
around August 1996.  Rogers showed him a
picture of the victim and proceeded to question Appellant for about twenty-five
minutes.  Rogers then started recording
the interview, stated the names of the persons present, and read Appellant his
Miranda[4]
warnings.  Appellant stated that he understood
his rights.  The following exchange
ensued:

ROGERS:  Okay. 
And understanding what those rights are, are
you willing to waive those rights at this time? And talk with us about this
investigation?  Understanding that, that
you can stop the interview at this time?

 

APPELLANT:  I want to stop. I want to stop right
now.  

 

The tape
recorder was turned off for about eight minutes and then Rogers began recording
again.  

At
this point, the versions of the story change. 
At the suppression hearing, Tinajero did not
recall that Appellant had asked to stop the interview.  When presented with the transcript of the
tape recording, he testified as follows:








Q:  Now then, it says, >I
want to stop right now,=
and the time is 11:28.  Now then, we have
restarted this voluntary statement at it is 11:36.  Does that sound about right, that y=all turned the
tape off for about eight minutes?

 

A:  I guess that=s
correct, yes.

 

Q:  Well, as best as your recollection is, eight
to ten minutes --

 

A:  Yes, sir.

 

Q:   -- you turned the tape off.  What did you talk about?

 

A:  To tell you the truth, I don=t actually recall exactly what we
talked about because I am not a homicide investigator so I never directed any
questions to Mr. Urias about the homicide.  I never really actually spoke to him about
the homicide once Mr. Rogers took over.

 

Q:  Did you make any statements to him that if he
would talk about this, you would help him like you did in Pecos?

 

A:  No sir. 
I never related anything about helping him on the homicide like we did
in Pecos.

 

Q:  Did you ever mention anything at all about >helping him like we did in Pecos= concerning anything during that eight minutes?

 

A:  No, sir, I didn=t. 
I don=t
recall.  Carl Rogers was handling the
interview at that time and, like I said, I am not a homicide investigator so I didn=t
even know what to ask him about a homicide.

 

Q:  I am not asking you what you asked.  What did you hear?  What was said by Mr. Rogers?

 

A:  I don=t
recall.

 

Q:  So we have got eight minutes that you
completely forgot what happened?

 

A:  I know that at one time I went to get him a
drink.  I offered and it could have been
at that time.  When we initially began
the interview, I asked him if he wanted something to drink and he
declined.  Later on he said he would take
that drink now.  I stepped out to go get
him a Coke and brought it back.

 

Q:  And that=s
when the tape wasn=t
going?








A:  That=s
possible.  I don=t
really recall.  I didn=t take any notes regarding that
statement so it is possible that that=s
when that --

 

Q:  So we will just have to listen to the tape
real close and we can hear the door on when you came and went; right?

 

A:  Well, no. 
Like you said a minute ago, that was -- if that=s
when -- you asked if that is when the tape was stopped and I presume it was
when I stepped out to get him a drink.

 

Q:  So your testimony to the Court for those
eight minutes is you don=t
recall anything that was said?

 

A:  That=s
correct.

 

Rogers didn=t
remember much either:

 

Q:  Okay. 
So after that, how come you questioned him anymore [sic]?

 

A:  Well, at the time that he advised me that he
wanted to stop, I did stop the tape, and that=s what the transcript
reflects.  At the time that I stopped the
tape, I believe I asked him something to the effect if that was it, did he want
to stop.  He was hesitant.  He obviously was in a position where he was wanting to think. 
That is what it appeared to me.

 

Q:  Well, but he said, >I
want to stop.=  That=s
what he articulated to you?

 

A:  And we stopped at that time.

 

Q:  All right. 
And so why don=t
you take your recorder and leave and put him back in his cell like he has
requested?

 

A:  At a further point in time, he advised that
he wanted to continue.

 

Q:  Well, he has also said he wants to stop, did
he not?

 

A:  Yes, sir.

 

Q:  And proper procedure is when a man wants to
quit questioning, you quit; correct?

 

A:  And we did, yes, sir.

 

Q:  All right. 
And so you can put him back in the cell and forget it; right?








A:  Yes, sir.

 

Q:  But you didn=t do that?

 

A:  No, sir.

 

Q:  All right. 
And it is your testimony that it is him wanting to --

 

A:  I don=t
recall what was said during that period of time, but he indicated that he did,
in fact, want to think about it, and subsequent to that he said he wanted to
make the statement.

 

Q:  Okay. 
You don=t recall
what he said or you said in that eight minutes?

 

A:  I am telling you generally what transpired
during that period of time and that=s
basically what I recall of it.  

 

Q:  Well, do you remember any statements that
were made in those eight minutes?

 

A:  I do not remember any verbatim statements
that were made in those eight minutes, no, sir.

 

Appellant
testified that after he told Rogers he wanted to stop, the officer  continued to question him:

Q:  And did you tell him that you wanted to stop
the questioning?

 

A:  Yes, I did, sir.

 

Q:  And did he then turn off the recorder?

 

A:  Yes, he did, sir.

 

Q:  Did he quit questioning you?

 

A:  Yes, sir. 
On the matter of the murder?

 

Q:  Yeah.

 

A:  Yes, sir.

 

Q:  Then what did he do?

 








A:  He started talking to me about -- first I
stopped and sat a minute quiet.  And then
they asked -- they offered me the drink again and then I said yes.  Mr. Mario did leave and went to pick up --
went and brought me the drink.  Then Mr.
Carl Rogers was talking to me that it would be okay if I would cooperate as
well as I was cooperating with Mr. Mario and that he would be able to help --
he would be wanting to help me out as much as he could
in this other -- in any way he could for this matter.

 

Q:  So he promised to help you in this case?

 

A:  Yes, sir. 
That everything was going to be okay if I would help him out B 

 

Q:  And that=s
when you --

 

A:  -- in this case, the murder case.

 

Q:  Okay. 
And that=s
whenever you made your statement after that?

 

A:  Yes, sir.

 

.          .          .

 

Q:  Whenever you said you wanted to quit talking
to them, did they leave you alone or did they keep staying in there with
you?  What did they do?

 

A:  They -- No. 
Mr. Carl Rogers, like I said, he was being friendly and telling me that
he would -- it would be nice for him to help me -- to help him out in this
case, the murder case, and he would be willing to cooperate as much as he could
to help me out.

 

Q:  So he did not -- he continued to question you
as well?

 

A:  Yes, sir.

 

Q:  After you had told him to stop?

 

A:  Yes, sir. 


 

 Rogers himself
admitted as much at trial:

 

Q:  Well, at that point in time he had indicated
to you, I don=t want to
be interviewed anymore; correct?

 








A:  Mr. Greenhaw, I did
not understand him to say that he did not want to be interviewed further.  He said he wanted to stop and I stopped the
tape.

 

Q:  >I
want to stop.  I want to stop right now.= 
He said that?

 

A:  Yes, sir, he did.

 

Q:  You stopped the tape?

 

A:  That=s
correct.

 

Q:  But you didn=t leave, did you?

 

A:  No, sir.

 

Q:  And then there was a discussion off the tape,
wasn=t
there?

 

A:  Yes, sir.

 

.          .          .

 

Q:  Why did you turn that tape off?  I mean, it is going.  Why didn=t you leave when he exercised his
Miranda rights?

 

A:  I turned the tape off because he said he
wanted to stop.

 

Q:  Why didn=t you leave?

 

A:  He didn=t
indicate that he wanted to leave.

 

Q:  Was he free to leave?

 

A:  He was free to be returned to the jail.

 

Q:  He was in jail; right?

 

A:  Yes, sir. 
Yes, sir.

 

Q:  But you were free to leave, were you not?

 

A:  Yes, sir. 
We were free to leave.

 

Q:  But you didn=t?

 








A:  No, sir.

 

Q:  So you continued to talk with him after he
said, >I want
to stop=?

 

A:  What I -- I continued to talk to him.

 

Q:  Did you --

 

A:  I continued to talk to him.    

 

At
trial, Tinajero claimed that neither he nor Rogers
interrogated Appellant during the ten minute time lapse, but he admitted
leaving the room to get a soft drink.  He
had returned by the time the recorder was turned on the second time.  He later testified that Amaybe Mr. Rogers said he --something
about being at the right place at the wrong time, something like that.@ 


Q:  So you thought he wanted a breather and then
the interrogation continued even though he had said >stop=?

 

A:  No, we did not interrogate him after he said >stop.=  We did not interrogate him about anything
after he said he wanted to stop.

 

Q:  I thought you really didn=t have any
recollection of those eight minutes?

 

A:  I basically don=t.  And I know that at the suppression hearing I
had forgotten part of the -- what happened. 
But, you know, I remember a lot of it now of what happened and I have
talked with Mr. Rogers since then and --

 

Rogers
testified that he began recording again because Appellant agreed to continue
with the interview.  During the second
taping sequence, Appellant stated that he did not need his rights read to him
again.  He then proceeded to tell Rogers
that he and his accomplice had shot the victim in the head so that they
could steal his Jeep.  They then drove
the Jeep to Mexico to be sold, so that a drug-related debt could be paid off.

STANDARD OF REVIEW








With
regard to motions to suppress, we review the trial court=s
findings of fact under an abuse of discretion standard and will not disturb
those findings as long as they have support in the record.  Villarreal v. State,
935 S.W.2d 134, 138 (Tex.Crim.App. 1996); Whitten
v. State, 828 S.W.2d 817, 820 (Tex.App.--Houston
[1st Dist.] 1992, pet. ref=d);
Romero v. State, 800 S.W.2d 539, 543 (Tex.Crim.App.
1990).  The reviewing court must
give almost total deference to the trial court=s
determination of historical facts.  Guzman v. State, 955 S.W.2d 85, 89 (Tex.Crim.App.
1997); Gordon v. State, 4 S.W.3d 32, 35 (Tex.App.--El
Paso 1999, no pet.).  In contrast,
the trial court=s
conclusions of law and the application of those principles to the facts of the
case are to be reviewed de novo.  State v. Ross, 32 S.W.3d 853, 856 (Tex.Crim.App. 2000).  The State correctly points out that because
there were no explicit findings of historical facts by the trial court in this
case, the evidence must be viewed in a light most favorable to the trial court=s ruling.  Carmouche v. State, 10 S.W.3d 323, 327 (Tex.Crim.App.
2000).  Where, as here, the
suppression issue has been consensually relitigated
at trial, we review the entire record, not just the record made at the
suppression hearing, to determine whether the confession was voluntary.  See Rachal v.
State, 917 S.W.2d 799, 809 (Tex.Crim.App.
1996).  Moreover, the trial court=s ruling should be upheld if it is
correct on any theory of law applicable to the case.  Ross, 32 S.W.3d at
855‑56.

VOLUNTARINESS OF CONFESSION








In
his sole point of error, Appellant claims that the trial court erred in denying
the motion to suppress because his confession was obtained in violation of his
Miranda rights.  If a suspect
indicates in any manner, at any time prior to or during questioning, that he
wishes to remain silent, the interrogation must cease.  Miranda, 384 U.S. at
473-74, 86 S.Ct. at 1626-27, 16 L.Ed.2d at 723; Mayes
v. State, 8 S.W.3d 354, 358 (Tex.App.--Amarillo
1999, no pet.).  Thereafter, the
invocation of that right by the suspect must be Ascrupulously
honored.@  Maestas v. State, 987 S.W.2d 59, 61-62 (Tex.Crim.App.
1999), quoting Michigan v. Mosley, 423 U.S. 96, 96 S.Ct.
321, 46 L.Ed.2d 313 (1975); Mayes, 8 S.W.3d at 858.  This does not mean that no further
questioning can ever occur, but rather that there must be an end to the
proceeding sufficient to indicate that the police respected the suspect=s request.  Mayes, 8 S.W.3d at
858.  If a statement is governed
by Miranda (i.e. the suspect is in custody), then a failure to cut off
questioning after a suspect invokes his right to remain silent violates his
rights and renders any subsequently obtained statements inadmissible.  Mosley, 423 U.S. 96, 113, 96 S.Ct. 321, 331, 46 L.Ed.2d 313; Sterling v. State,
830 S.W.2d 114, 116 (Tex.Crim.App. 1992), cert.
denied, 506 U.S. 1035, 113 S.Ct. 816, 121 L.Ed.2d
688 (1992); Dowthitt v. State, 931
S.W.2d 244, 257 (Tex.Crim.App. 1996).  A law enforcement officer may not continue to
question the suspect until the officer succeeds in persuading the suspect to
change his mind and talk.  Hearne v. State, 534 S.W.2d 703, 705 (Tex.Crim.App.
1976); Dowthitt, 931 S.W.2d at 257.  Article 38.22 prohibits the admission of a
written or oral statement made as a result of custodial interrogation by an
accused in a criminal proceeding without the warnings required by Miranda.  Tex.Code Crim.Proc.Ann.
art. 38.22, ''
2, 3 (Vernon 1979 and Vernon Pamphlet 2003); Holland v. State, 770
S.W.2d 56 (Tex.App.-‑Austin 1989), aff=d,
802 S.W.2d 696 (Tex.Crim.App. 1991).  








Prior
to Miranda, the admissibility of a suspect=s
confession was evaluated under a voluntariness
test.  Dickerson v.
U.S., 530 U.S. 428, 432-33, 120 S.Ct. 2326, 2330,
147 L.Ed.2d 405 (2000).  Two
constitutional bases emerged for determining voluntariness:  the Fifth Amendment right against
self-incrimination and the Due Process Clause of the Fourteenth Amendment.  Id. 
The United States Supreme Court tracked the history in Dickerson,
noting that Afor the
middle third of the 20th century our cases based the rule against admitting
coerced confessions primarily, if not exclusively, on notions of due process.@ 
Id.  The test was
ultimately refined into an inquiry that examined whether a defendant=s will was overborne by the
circumstances surrounding the giving of a confession.  Dickerson, 530 U.S. at 434, 120 S.Ct. at 2331, citing Schneckloth
v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed. 2d 854 (1973).  The
due process test considers Athe
totality of all the surrounding circumstances--both the characteristics of the
accused and the details of the interrogation.@  Id.

With
the advent of Miranda, however, the focus shifted to the Fifth Amendment
and its application to custodial interrogation. 
A[C]oercion inherent in custodial interrogation blurs the line
between voluntary and involuntary statements, and thus heightens the risk that
an individual will not be >accorded
his privilege under the Fifth Amendment . . . not to be compelled to
incriminate himself.=@ Dickerson, 530 U.S. at 435, 120
S.Ct. at 2331, citing Miranda, 384 U.S. at
439, 86 S.Ct. at 1602.








Two
years after Miranda was decided, Congress enacted 18 U.S.C. ' 3501, which in effect, designated voluntariness as the touchstone of admissibility, omitted a
warning requirement, and instructed the trial courts to consider a nonexclusive
list of factors relevant to the circumstances of a confession.  Dickerson, 530 U.S. at 436, 120 S.Ct. at 2332. 
Concluding that the legislative intent was to overrule Miranda,
the Dickerson court considered whether the Miranda decision
announced a constitutional rule or simply regulated evidence in the absence of
congressional direction. Dickerson, 530 U.S. at 436-37, 120 S.Ct. 2332-33.  The
court itself acknowledged its prior decisions in which it referred to the Miranda
warnings as prophylactic and not themselves rights
protected by the Constitution.  Dickerson,
530 U.S. at 437-38, 120 S.Ct. at 2333.  Two of these decisions were of significance
to an opinion by the Texas Court of Criminal Appeals.  See Michigan v. Tucker, 417 U.S. 433,
94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); Oregon v. Elstad, 470 U.S. 298, 105 S.Ct.
1285, 84 L.Ed.2d 222 (1985).  Both of
these cases involved the failure to give the Miranda warnings rather
than the failure to scrupulously honor the warnings given.  Nevertheless, in Baker v. State, 956
S.W.2d 19 (Tex.Crim.App. 1997), the court determined
that A[t]he
failure to scrupulously honor a suspect=s
invocation of his right to remain silent by continuing questioning is not
necessarily coercive.@  Id. at 23.  This holding was premised on the concept that
statements taken in violation of Miranda are not obtained in violation
of law.  Baker, 956
S.W.2d at 24.  The United States
Supreme Court retreated from that tenet in Dickerson and abandoned the
totality of the circumstances test.

The disadvantage of
the Miranda rule is that statements which may be by no means
involuntary, made by a defendant who is aware of his >rights,= may nonetheless be excluded and a
guilty defendant go free as a result. 
But experience suggests that the totality-of-the-circumstances test
which ' 3501
seeks to revive is more difficult than Miranda for law enforcement
officers to conform to, and for courts to apply in a consistent manner.

 

.          .          .

 

In sum, we conclude
that Miranda announced a constitutional rule that Congress may not
supersede legislatively.  Following the
rule of stare decisis, we decline to overrule Miranda
ourselves.

 

530 U.S. at 444, 120 S.Ct. at 2336.

 








The
Court of Criminal Appeals has now embraced Dickerson.  In McCarthy v. State, 65 S.W.3d 47 (Tex.Crim.App. 2001), the court returned to the Abright and firm constitutional rule@ that applies to all suspects and law
enforcement officers.  Id.
at 52, citing Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).  While McCarthy involved the Fifth
Amendment right to counsel, we believe it should apply equally to the Fifth
Amendment right against self-incrimination. 
Our sister courts have agreed.  See Hill v. State, 78 S.W.3d 374 (Tex.App.--Tyler
2001, pet. denied); Mayes v. State, 8 S.W.3d 354 (Tex.App.--Amarillo
1999, no pet.).

In
Hill, a juvenile was certified to stand trial as an adult for the
offense of capital murder.  The
magistrate who administered the Miranda warnings decided to inquire
whether Hill understood 
the definition of Awaive.@ 
The opinion details the exchange:

According to his
testimony at the suppression hearing, the magistrate decided to inquire whether
Appellant understood what the term >waive= meant. 
Appellant answered, >No,
sir= and the magistrate proceeded with an
explanation of the term >waive.= 
During this explanation, Appellant, while shaking his head in the
negative, said >No,= again indicating a desire not to waive
his rights.  When he was finished, the
magistrate asked Appellant if he now understood what the term >waive=
meant and Appellant answered, >Yes, sir.=  The magistrate then asked Appellant if he
wished to >waive
or give up= his
right to remain silent.  Appellant again
answered, >No,
sir.=  The magistrate then asked affirmatively if
Appellant wished to remain silent and was told, >Yes, sir.=  This response was followed by Appellant being
asked if he wished to >waive
or give up= his
right to have an attorney present to advise him.  Again, Appellant responded, >No, sir.=  By this time, Appellant had unequivocally
invoked his rights six times.

 

The magistrate then
stated, >Very
well.  That concludes the statutory
warnings.=  At this point, the interview should have
ended. 

 

Hill, 78 S.W.3d at 385-86. 
The court noted that the magistrate then asked the proverbial one
question too many, inquiring whether the juvenile wanted to give a
statement.  Finding this to be an
improper inquiry,  the
court concluded:

After the magistrate
had stated that the warnings were concluded, he continued to interview
Appellant regarding the giving of a statement. 
In this regard, the magistrate=s
action constituted a re-institution of the interview with Appellant.  Appellant did not initiate the contact to reopen
the discussion, the magistrate did.  The
interview should have stopped at the first indication by Appellant that he
wished to invoke his rights. 
Accordingly, his right to remain silent was not scrupulously honored,
rendering his subsequent confession inadmissible.

 

Id. at
387.

 








Similarly,
in Mayes, as one officer was admonishing the defendant of her rights,
she interrupted and said, AI=m going to stop talking.@ 
Mayes, 8 S.W.3d at 356.  Despite this pronouncement, the officer
continued with his comments and questions. 
About four minutes later, Mayes again declared, AI=m going to shut up.  I=m
not going to say another goddamned thing.@  The detectives neither paused nor ended the
proceeding.  Rather, they continued as if
uninterrupted, and finally persuaded Mayes to tell the story which they had
been waiting to hear.  Id.

Here,
the officers stopped the recording once Appellant declared that he wanted to
stop, but they admittedly did not terminate the interview.  While the officers parsed words as to whether
Appellant was Ainterrogated@ at that point, the form the statements
took is irrelevant.  Mayes, 8
S.W.3d at 360 (holding that regardless of whether the officers uttered
declaratory rather than interrogatory statements, the officers were pressing
the defendant for information about the crime and their actions constituted
interrogation).  We conclude that the
trial court erred in admitting Appellant=s
statement.  

HARM ANALYSIS








Having
found error, we must necessarily proceed to a harm analysis.  Where, as here, the appellate record in a
criminal case reveals constitutional error, we must reverse a judgment of
conviction unless we determine beyond a reasonable doubt that the error did not
contribute to the conviction.  Tex.R.App.P. 44.2(a); McCarthy, 65 S.W.3d at 52.  This
decision is not determined solely on the basis of whether there was sufficient
evidence, independent of the defendant=s
inadmissible statement, for a reasonable jury to reach the same
conclusion.  Id. at
55, citing Satterwhite v. Texas, 486 U.S. 249,
108 S.Ct. 1792, 100 L.Ed.2d 284 (1988).  Instead, we must review whether the admission
of the statement contributed to the verdict of guilt, regardless of whether
there is independent evidence which is otherwise sufficient to sustain the
verdict.  Id.

Nor
are we to focus on the propriety of the outcome of the trial.  Westbrook v. State,
29 S.W.3d 103, 119 (Tex.Crim.App. 2000).  We should calculate, as nearly as possible,
the probable impact of the error on the jury in light of the other
evidence.  Id.
at 119.  A defendant=s statement, especially a statement
implicating him in the commission of the charged offense, is unlike any other
evidence that can be admitted against the defendant.  Arizona v. Fulminante,
499 U.S. 279, 296, 111 S.Ct. 1246, 113
L.Ed.2d 302 (1991):

[A] defendant=s
own confession is probably the most probative and damaging evidence that can be
admitted against him. . . .  [T]he
admissions of a defendant come from the actor himself, the most knowledgeable and
unimpeachable source of information about his past conduct.  Certainly, confessions have profound impact
on the jury, so much so that we may justifiably doubt its ability to put them
out of mind even if told to do so. 

 

See id. at 296, 111 S.Ct. at 1257.








While
we recognize that at the time Appellant was interrogated, the Dickerson
and McCarthy opinions had not issued, we must nevertheless conclude that
the source and nature of the error here was a blatant violation of Appellant=s Fourth Amendment rights by law
enforcement officers.  Declaring the
error harmless would not encourage law enforcement to follow the bright line
constitutional mandates in the future. 
Furthermore, the State certainly emphasized and relied upon the
confession throughout the trial.  Indeed,
it offered no other evidence linking Appellant to the crime.  Consequently,  it is highly probable that the jury
relied on the confession when reaching the verdict.  AIf
the jury believes that a defendant has admitted the crime, it doubtless will be
tempted to rest its decision on that evidence alone, without careful
consideration of the other evidence in the case.  Apart, perhaps, from a videotape of the crime,
one would have difficulty finding evidence more damaging to a criminal
defendant=s plea of
innocence.@  Fulminante,
499 U.S. at 313, 111 S.Ct. at 1266 (Kennedy, J.,
concurring).  Regardless of whether there
was, apart from Appellant=s
statement, sufficient evidence to support the conviction, we find it impossible
to say there is no reasonable likelihood that the State=s
use of Appellant=s
statement materially affected the jury=s
deliberations.   See McCarthy, 65 S.W.3d at 56; Westbrook, 29 S.W.3d at 119.  Accordingly, we sustain Appellant=s sole point of error.  We reverse the judgment of the trial court
and remand this cause to that court for a new trial.

 

January 16, 2003

                                                           
              

                                                                                    ANN
CRAWFORD McCLURE, Justice

 

Before Panel No. 5

McClure, Chew, JJ.,
and Preslar, C.J. (Ret.)

Preslar,
C.J. (Ret.)(sitting by assignment)

 

(Publish)











[1]  The record
contains oblique references to Gardea=s association with the Mexican mafia.  At the time of trial, he was incarcerated in
a federal penitentiary.  





[2]  Appellant had
provided information to Tinajero when he was jailed
on a previous drug charge in June 1996. 
He received a favorable plea bargain which reduced the time served from
five years to nine months.  





[3]  Tinajero told Rogers about the appointed counsel and
testified that he knew Appellant Ahad an
attorney, but I forgot to call the attorney.@





[4]  Miranda v. Arizona, 384 U.S.
436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 723 (1966).