

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-22-00494-CR

Brian Everett **DAY**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 25th Judicial District Court, Guadalupe County, Texas
Trial Court No. 18-0279-CR-A
Honorable William D. Old III, Judge Presiding

Opinion by:     Luz Elena D. Chapa, Justice

Sitting:        Patricia O. Alvarez, Justice
                Luz Elena D. Chapa, Justice
                Irene Rios, Justice

Delivered and Filed: June 20, 2024

AFFIRMED

Appellant Brian Everett Day challenges his judgment of conviction for capital murder. He argues the trial court erred by (1) denying his motion to suppress certain video-recorded statements, (2) failing to instruct the jury as to the voluntariness of his video-recorded statements, and (3) failing to instruct the jury as to his defense of property. We affirm.

## BACKGROUND

On the night of December 21, 2017, Day shot and killed two neighbors near the friendship gate between their properties. Day was indicted for capital murder. *See* TEX. PENAL CODE

§ 19.03(a)(7) (murder of more than one person during same criminal transaction). A jury found Day guilty, and the trial court sentenced him to life without the possibility of parole. This appeal followed.

### TWO-STEP INTERROGATION TECHNIQUE

Day argues the trial court erred by denying his motion to suppress certain video-recorded statements because the police officers at the scene deliberately employed a "two-step" interrogation technique, in violation of *Missouri v. Seibert*, 542 U.S. 600, 611 (2004). *See generally Carter v. State*, 309 S.W.3d 31, 32 (Tex. Crim. App. 2010) (adopting Justice Kennedy's concurrence in *Seibert* as law applying to deliberate two-step interrogations). The State, however, argues Day failed to preserve his two-step interrogation complaint for appeal.

"Rule of Appellate Procedure 33.1 requires a litigant to present his objection to the trial court by a timely request, objection, or motion, that is sufficiently specific to make the trial court aware of his complaint." *Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim. App. 2016); *see* TEX. R. APP. P. 33.1. "We have long eschewed hyper-technical requirements for error preservation." *Vasquez*, 483 S.W.3d at 554. "Litigants need not employ 'specific words or technical considerations' to avoid forfeiting their complaints." *Id.* (quoting *Layton v. State*, 280 S.W.3d 235, 239 (Tex. Crim. App. 2009)). "Instead, a party need only let the trial court know what he wants and why he feels himself entitled to it clearly enough for the judge to understand him." *Id.* "But, a general or imprecise objection will not preserve error for appeal unless 'the legal basis for the objection is obvious to the court and to opposing counsel.'" *Id.* (quoting *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006)).

Here, Day explains "[w]hile not directly citing [*Seibert*], [he] did raise a *Seibert* complaint by citing the Fifth Amendment and *Miranda*." In support of his pretrial motion to suppress, Day cited his constitutional rights along with *Miranda*. But the record shows Day never objected to the

admission of his video-recorded statements via body cam based on a *Seibert* violation. Nor is there any basis in the record to conclude the trial court or opposing counsel understood Day's *Miranda*-based objection was raising a *Seibert* violation. Because Day failed to preserve his two-step interrogation complaint, we may not consider whether the two-step interrogation "was deliberately employed" or whether Day was harmed by the denial of his motion "on the ground that it was obtained as a result of a two-step interrogation." *Id.* at 557 ("Appellant failed to properly preserve his two-step interrogation complaint for appeal. Therefore, we may not determine whether a two-step interrogation technique was deliberately employed or whether appellant was harmed by the admission of his recorded confession on the ground that it was obtained as a result of a two-step interrogation.").

Accordingly, Day's first issue is overruled. *See id.* at 554–57 (concluding objection on *Seibert* grounds not sufficiently specific to preserve error for review where (1) motion to suppress challenged admission of statements on grounds they were involuntary, unwarned, and out of compliance with Article 38.22, but did not challenge two-step nature of interrogation in written motions, (2) issue was only mentioned by counsel once during closing argument, (3) State did not respond to issue in its closing and therefore did not understand nature of comment, (4) officer who could have testified on whether there was two-step interrogation was not called to testify, and (5) trial court's ruling on written motions to suppress, along with its explicit finding that motions did not allege a deliberate two-step interrogation process, showed it did not understand nature of appellant's two-step interrogation complaint).

### RIGHT TO REMAIN SILENT

Day further argues the trial court erred by denying his motion to suppress certain statements recorded via body cam because the police did not scrupulously honor his properly invoked right to remain silent.

### A. Standard of Review

We apply "a bifurcated standard of review when evaluating a trial court's ruling on a motion to suppress." *Monjaras v. State*, 664 S.W.3d 921, 926 (Tex. Crim. App. 2022); *see, e.g.*, *Kupferer v. State*, 408 S.W.3d 485, 488 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). "We afford almost total deference to a trial court's determination of historical facts if supported by the record, especially when the factfinding is based on an evaluation of credibility and demeanor." *Monjaras*, 664 S.W.3d at 926. "However, if evidence is conclusive, such as indisputable video evidence, we may disregard any trial court findings inconsistent with the conclusive evidence." *Id.* Secondly, "we conduct a de novo review when reviewing a trial court's application of law to facts that do not depend on credibility and demeanor." *Id.* "'We view the record in the light most favorable to the trial court's ruling and uphold the ruling if it is supported by the record and is correct under any theory of the law applicable to the case.'" *Id.* (quoting *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019)).

If we conclude the trial court erred in denying the motion to suppress, we must then consider whether the error was harmless. *See* TEX. R. APP. P. 44.2(a); *Sandoval v. State*, 665 S.W.3d 496, 521–22 (Tex. Crim. App. 2022). Because the admission of a defendant's own incriminating statements would violate the defendant's constitutional right, we must "reverse a judgment of conviction or punishment unless [we] determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment." *See* TEX. R. APP. P. 44.2(a); *see, e.g.*, *Hennessy v. State*, 268 S.W.3d 153, 161 (Tex. App.—Waco 2008, pet. ref'd). "In making this determination, we do not focus on the propriety of the trial's outcome but on calculating, as nearly as possible, the probable impact of the error on the jury in light of the other evidence." *Hennessy*, 268 S.W.3d at 161. Error is harmless if the verdict would have been the same if the erroneous evidence had not been admitted. *See Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007).

We may consider such nonexclusive factors as the nature of the error, the extent the State emphasized the error, the error's probable collateral implications, and the weight the jury likely would have assigned the error during deliberation. *See Snowden v. State*, 353 S.W.3d 815, 820 (Tex. Crim. App. 2011).

### B. Law

"Under [*Miranda v. Arizona*, 384 U.S. 436 (1966)], law enforcement officers are required to respect a defendant's invocation of his right to remain silent by cutting off questioning." *Sandoval*, 665 S.W.3d at 520; *see, e.g.*, *Ramos v. State*, 245 S.W.3d 410, 417–18 (Tex. Crim. App. 2008) ("'If the individual [in custody] indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" (alteration in original) (quoting *Miranda*, 384 U.S. at 473–74)). "The suspect is not required to use any particular phraseology to invoke the right to remain silent." *Kupferer*, 408 S.W.3d at 489; *see also Ramos*, 245 S.W.3d at 418. "'[A]ny declaration of a desire to terminate the contact or inquiry . . . should suffice. The same is true of silence in the face of repeated questioning, or an effort to end the contact with the interrogator.'" *Ramos*, 245 S.W.3d at 418 (alterations in original) (quoting W. LaFave, et al., *Criminal Procedure* § 6.9(f) at 853 (3d ed. 2007)).

"A suspect's right to cut off questioning must be 'scrupulously honored.'" *Sandoval*, 665 S.W.3d at 520 (quoting *Michigan v. Mosley*, 423 U.S. 96, 103–04 (1975)). "But a suspect's invocation of this right must be unambiguous, and there is no requirement that law enforcement clarify ambiguous remarks." *Id.* However, law enforcement may clarify a suspect's wishes when faced with an ambiguous invocation. *Kupferer*, 408 S.W.3d at 489. "If the suspect's statement is not an unambiguous or unequivocal request [to terminate the interview or to invoke the right to silence], the officers have no obligation to stop questioning him." *Id.* (alteration in original (quoting *Davis v. United States*, 512 U.S. 452, 461–62 (1994)). "In determining whether the right

to remain silent was unambiguously invoked, courts look at the totality of the circumstances." *Id.* "Ambiguity exists when the suspect's statement is subject to more than one reasonable interpretation under the circumstances." *Id.* (citing *Williams v. State*, 257 S.W.3d 426, 432 (Tex. App.—Austin 2008, pet ref'd)). "An officer's failure to stop custodial interrogation after an unambiguous invocation of the right to remain silent renders any later obtained statements inadmissible." *McCulley v. State*, 352 S.W.3d 107, 120 (Tex. App.—Fort Worth 2011, pet. ref'd).[1]

### C. The Record

Turning to the record, at the pre-trial hearing Day moved to suppress his statements made at the scene and those made during his later questioning at the Guadalupe County Sheriff's Office. In the motion, Day argued he initially invoked his right to remain silent after he was read his *Miranda* warnings and responded unambiguously by stating "no, sir" to whether he wanted to speak to an investigator. He contended any statements he made after that statement, whether he was at the scene of the crime or during his later questioning, were involuntary. As a result, law enforcement violated his constitutional rights and his rights under Article 38.22 of the Texas Code of Criminal Procedure.

At the hearing, Thomas Jones, a patrol sergeant for the Guadalupe County Sheriff's Office, testified he was dispatched to the home of the decedents after a child called 911 to report Day had shot his parents. Sergeant Jones arrived at the large property and he, along with a few deputies, proceeded to the backyard where, along the fence line, he found two dead people on the

---

[1] "Once a person has unambiguously invoked his right to cut off questioning, a resumption of questioning is permissible only if it is consistent with scrupulously honoring the defendant's invocation." *Sandoval*, 665 S.W.3d at 521. In assessing whether the right was scrupulously honored, we consider: (1) whether law enforcement officials informed the suspect of the "right to remain silent prior to . . . initial" and "subsequent questioning"; (2) "whether police honored the suspect's initial invocation of the right to remain silent"; (3) "the length of time between initial questioning and subsequent questioning"; and (4) "whether the subsequent questioning focused on a different crime." *Id.* "[T]he scrupulously honored test is not met where the police . . . resumed questioning after a short interval during which custody continued." *Ramos*, 245 S.W.3d at 419 (alterations in original) (quoting *Criminal Procedure* § 6.9(f) at 839–40) (internal quotation marks omitted).

neighboring property—Day's property. At that moment, Day approached in an all-terrain vehicle. Sergeant Jones testified Day had blood splatter all over his face and clothing. He immediately detained Day in handcuffs and placed him in his patrol vehicle, without any resistance, a few hundred yards away at the front of the decedents' property. Sergeant Jones testified he had no trouble communicating with Day; Day walked to the patrol unit himself, but he also smelled of alcohol. He testified he then read Day his *Miranda* warnings and sat him down in the back of the patrol unit after searching him for weapons. Sergeant Jones testified Day did not invoke his right to remain silent, he continued to talk to him without prompting, and he told him the decedents were "on [his] property."

State's Exhibit 1—a copy of a partial recording of Sergeant Jones's body cam video—was then admitted into evidence without objection. The video confirms Sergeant Jones's testimony. It shows Sergeant Jones approaching the fence line from the decedents' property where two bodies lay on the ground on Day's side of the fence line. Day, standing nearby on his property, has his hands raised in the air. Sergeant Jones asks Day, "What happened?" Day replies, "My neighbors here trespassed. They would not leave after I asked them to leave." Sergeant Jones then places Day in handcuffs. Sergeant Jones asks, "Where is their gun?" Day replies, "Their gun is in my vehicle, sir. I picked their gun up." Sergeant Jones then walks Day to his patrol vehicle—parked in the front of the decedents' property. During this time, Day states, "I asked them to please leave my property." A few minutes later, he again states without prompting, "They were on my property, sir," and "I asked them not to trespass." Day then says something inaudible and explains, "What was I supposed to do? That guy had a rifle in his hand."

Sergeant Jones then places Day in the back of his patrol unit and reads Day his *Miranda* warnings and asks Day whether he understood his *Miranda* warnings. Day states, "Yes, sir." Sergeant Jones then asks Day whether he wants "to talk to [their] investigator," to which Day

replies, "No, sir." Sergeant Jones replies stating, "With an attorney or what?" After a few seconds, Day states, "I have clear, posted, 'no trespassing' signs." Sergeant Jones then interrupts Day, asking him to watch his arm because he was closing the door to the patrol unit and returns to the scene.

About four minutes later, Sergeant Jones returns to the patrol unit and then removes Day from it to adjust his handcuffs. As Day exits the vehicle, he says, "I'm sorry. I know I was drinking. I readily admit that. My property is clearly posted 'no trespassing.'" Then, as Sergeant Jones adjusts the handcuffs, Day states, "I asked them to please leave, and I was told to 'go eff myself.' He popped a round, and when he did, I opened up." About eighteen minutes later, Sergeant Jones again returns to the vehicle, and Day complains of pain from the handcuffs. Sergeant Jones removes Day from the vehicle so he could "relax," and Day states, "These guys over here, they've been shooting at me, sir. I did not want tonight to happen. They've been shooting at me and shooting at me. It's documented." Sergeant Jones asks Day for the names of the decedents, and Day provides them and adds, "There's bullet holes in my front yard. Yes, sir. He's been shooting at me. It started 'cause he had horses that kept going through the fence." While Sergeant Jones adds another set of handcuffs to make Day more comfortable, Day adds, "These guys have been torturing [me and my ex-fiancée] for a year and a half to two years." Then Day states, "I heard gunshots tonight, sir. And I asked 'what's going on?' and the [male neighbor] told me point blank 'f you.' He popped some rounds off at me, and when he did, I opened up."

After the video was played, Sergeant Jones testified he transported Day from the scene of the crime to a Sheriff's Office interview room for questioning by Lieutenant Craig Jones. Lieutenant Jones Mirandized Day, and Day signed a written *Miranda* statement. Both Lieutenant Jones and Sergeant Jones—who remained in the interview room for Lieutenant Jones's questioning—testified Day did not ask for an attorney until the very end of the interview, upon

which the interview was terminated. Sergeant Jones admitted he did not inform Lieutenant Jones that Day had responded "no" to his question of whether he wanted to speak to an investigator.

After the hearing, the trial court denied Day's motion to suppress and later filed findings of fact and conclusions of law.[2] The trial court's findings of fact and conclusions of law are consistent with the evidence. The trial court, found as follows:

> Sgt. Thomas Jones asked the defendant his name and read him his Miranda/statutory rights. The defendant stated that he understood the warnings and said "No, sir" when asked if he wanted to talk to an investigator. Sgt. Thomas Jones then asked, "with an attorney or what?" The defendant did not respond to this statement. Immediately after that, the defendant, unprompted, stated, "I have clear posted 'no trespassing' signs.'"

Based on these findings, the trial court included the following in its conclusions of law:

> The Court finds that the defendant's decision to repeatedly discuss the circumstances of the offense without any prompting or questioning rendered the invocation of his right to remain silent ambiguous. In other words, the defendant did not unambiguously invoke his right to remain silent. The Court also finds that because his on-scene statements to Sgt. Thomas Jones were made without any prompting or questioning by law enforcement, they were not the product of an interrogation.

### D. Analysis

Here, affording almost total deference to a trial court's determination of historical facts supported by the video evidence and viewing the record in the light most favorable to the trial court's ruling, we cannot conclude Day unambiguously invoked his right to remain silent. *See Sandoval*, 665 S.W.3d at 520–21. Even before Sergeant Jones placed Day in handcuffs, Day explained, while standing near his neighbors' bodies, his neighbors had trespassed and would not leave after he asked them to leave. Then, when asked whether he understood his Miranda rights and wanted to talk to an investigator, Day stated he understood his rights and did not want to talk

---

[2] The trial court issued its findings of fact and conclusions of law on March 6, 2023 in response to an order from this court.

to an investigator. Day never stated he did not want to talk to Sergeant Jones. He also never stated he wanted to invoke his right to remain silent and speak to an attorney. *See Hill v. State*, 78 S.W.3d 374, 385–87 (Tex. App.—Tyler 2001, pet. ref'd) (concluding juvenile invoked right to remain silent where he responded "no, sir" to whether he waived his right to remain silent). Nor did Sergeant Jones ask Day if he wanted to stop speaking to him. *See Ramos v. State*, 245 S.W.3d 410, 418–19 (Tex. Crim. App. 2008) (concluding right to remain silent unambiguously invoked where appellant, during course of questioning, told questioning officer he did not want to talk to him anymore). And Day did not otherwise remain silent. *See Kupferer*, 408 S.W.3d at 489–90 (concluding appellant's demeanor and statement—"[t]o tell you the truth, I really don't want to talk about it, but I mean,"—ambiguous).

Moreover, Sergeant Jones did not continue questioning Day after Day stated he did not want to talk to an investigator. *Williams*, 257 S.W.3d at 433–34 (concluding appellant's statement he wanted to "terminate everything" was not simply ignored by officer, but officer instead sought clarification before continuing interview). Instead, Sergeant Jones sought clarification by asking Day, "With an attorney or what?" *See Kupferer*, 408 S.W.3d at 489; *Williams*, 257 S.W.3d at 432–33 ("A police officer does not violate a suspect's right to remain silent when he attempts to clarify whether the suspect wishes to remain silent, and the suspect may thereafter choose to continue to speak about the offense."). A few seconds later without prompting, Day stated he had clear "no trespassing" signs on his property. When Sergeant Jones returned to the patrol unit two more times, Day discussed the incident each time unprompted.

Based on the totality of these circumstances, Day's alleged invocation of his right to remain silent was subject to more than one reasonable interpretation and therefore ambiguous. *See Kupferer*, 408 S.W.3d at 489–90 (concluding based on totality of circumstances including demeanor, appellant's statement—"[t]o tell you the truth, I really don't want to talk about it, but I

mean,"—clearly signaled indecision or ambivalence and suspect did not otherwise unambiguously express desire to remain silent, including appellant's demeanor immediately following statement, and reasonable officer could have interpreted statement as expression of anguish or remorse); *Williams*, 257 S.W.3d at 433–34 (holding appellant's statement he wanted to "terminate everything," when considered in context of his previous statements, was ambiguous and was indicative of his frustration at his detention and his attempts to determine whether he had been arrested); *cf. Ramos v. State*, 245 S.W.3d 410, 418–19 (Tex. Crim. App. 2008) (concluding right to remain silent invoked where State's own evidence at suppression hearing established appellant, during questioning, told officer "I don't want to talk to you. I don't want to talk about it anymore" and police officers left room, explaining statement "unambiguous, unequivocal, and unqualified assertion" of right); *Hill v. State*, 78 S.W.3d 374, 385–87 (Tex. App.—Tyler 2001, pet. ref'd) (concluding juvenile invoked right to remain silent where juvenile asked if he waived his right to remain silent and he responded "no, sir" and repeated variation of his response five additional times).[3] Accordingly, because we cannot conclude Day unambiguously invoked his right to remain silent, we cannot conclude the trial court erred by denying his motion to suppress. *See Kupferer*, 408 S.W.3d at 489.

---

[3] Even if Day had invoked his right to remain silent, nothing in the record shows he was subject to custodial interrogation at the time he spoke to Sergeant Jones at the scene of the crime. *See Lampkin v. State*, 470 S.W.3d 876, 891 (Tex. App.—Texarkana 2015, pet. ref'd) (providing custodial interrogation refers to "express questioning" along with "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (quoting *Alford v. State*, 358 S.W.3d 647, 653 (Tex. Crim. App. 2012)) (internal quotation marks omitted)). Other than asking Day "what happened?" as Day stood bloodied, near the decedents with his hands in the air, Sergeant Jones never subjected Day to express questioning in order to elicit an incriminating response from Day. None of Sergeant Jones' questions related to anything "other than those normally attendant to arrest and custody." *See id.*; *see also Jones v. State*, 795 S.W.2d 171, 174 n.3 (Tex. Crim. App. 1990) (concluding general and routine questions also do not constitute interrogation).

**JURY INSTRUCTIONS**

Day argues the trial court erred by failing to include jury instructions in the jury charge relating to (1) Article 38.22 Sections 6 and 7 and (2) defense of property. Day further argues the failure to include the instructions constituted egregious harm.

**A. Standard of Review**

Appellate courts review a claim of charge error through a two-step process: first determining whether jury charge error exists and then conducting a harm analysis if error is found to exist. *See, e.g.*, *Lozano v. State*, 636 S.W.3d 25, 29 (Tex. Crim. App. 2021).

**B. Article 38.22 Instructions**

**1. Law**

Turning to Day's contention the trial court erred by failing to charge the jury on Article 38.22 Sections 6 and 7, "[a] defendant may claim that his statement was not freely and voluntarily made and thus may not be used as evidence against him under several different theories: (1) Article 38.22, § 6—general voluntariness; (2) *Miranda v. Arizona* as expanded in Article 38.22, §§ 2 and 3 (the Texas confession statute); or (3) the Due Process Clause." *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008) (footnote omitted). "It may be involuntary under one, two, or all three theories. . . . The theory of involuntariness determines whether and what type of an instruction may be appropriate." *Id.* "Thus, the first step in deciding upon an appropriate jury instruction is identifying the theory of involuntariness." *Id.* Day argues his statements were involuntary because he was intoxicated, and he was therefore entitled to Article 38.22 Sections 6 and 7 instructions.

"Article 38.22 is aimed at protecting suspects from police overreaching. . . . The behavior of the police may or may not be a factor." *Id.* at 172. It also "sets out rules governing the

admissibility of an accused's written and oral statements that are the product of custodial interrogation." *Id.* at 171. Section 6 of Article 38.22 provides:

> In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions. If the statement has been found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause. Such order shall not be exhibited to the jury nor the finding thereof made known to the jury in any manner. Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof. In any case where a motion to suppress the statement has been filed and evidence has been submitted to the court on this issue, the court within its discretion may reconsider such evidence in his finding that the statement was voluntarily made and the same evidence submitted to the court at the hearing on the motion to suppress shall be made a part of the record the same as if it were being presented at the time of trial. However, the state or the defendant shall be entitled to present any new evidence on the issue of the voluntariness of the statement prior to the court's final ruling and order stating its findings.

TEX. CODE CRIM. PROC. art. 38.22 § 6. "Section 6 of Article 38.22 applies to *both* an accused's custodial and non-custodial statements because it provides that only voluntary statements may be admitted." *Oursbourn*, 259 S.W.3d at 171 (internal quotation marks omitted). A "question is raised" under Section 6 as follows:

> (1) a party notifies the trial judge that there is an issue about the voluntariness of the confession (or the trial judge raises the issue on his own); (2) the trial judge holds a hearing outside the presence of the jury; (3) the trial judge decides whether the confession was voluntary; (4) if the trial judge decides that the confession was voluntary, it will be admitted, and a party may offer evidence before the jury suggesting that the confession was not in fact voluntary; (5) if such evidence is offered before the jury, the trial judge shall give the jury a voluntariness instruction.

*Id.* at 175 (footnote omitted). "It is only after the trial judge is notified of the voluntariness issue (or raises it on his own) that a chain of other requirements comes into play, culminating in the

defendant's right to a jury instruction." *Id.* Once raised, the instruction provides: "'unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof.'" *Id.* (quoting § 6). Under Article 38.22, an intoxicated suspect is a "fact scenario[] that can raise a state-law claim of involuntariness." *Id.* at 172–73; *see, e.g.*, *Leza v. State*, 351 S.W.3d 344, 352–53 (Tex. Crim. App. 2011) (citing *Oursbourn*).

Article 38.22 Section 7 provides: "[w]hen the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement." TEX. CODE CRIM. PROC. art. 38.22 § 7. "The phrase 'the issue' refers to compliance with the statutory warnings set out in both Articles 15.17 (Duties of Arresting Officer and Magistrate) and 38.22, §§ 2 & 3, and the voluntariness of the defendant's waiver of the rights."[4] *Oursbourn*, 259 S.W.3d at 176 (quoting § 7). "The language 'where a *question* is raised' contrasts with the language found in Article 38.22, § 7 . . . which speaks of the *evidence* raising an issue." *Id.* at 175 (quoting § 6). For the issue "to be 'raised by the evidence' there must be a genuine factual dispute." *Id.* at 176 (quoting § 7). "The Section 7 instruction sets out the requirements of 38.22, § 2 or § 3 and asks the jury to decide whether all of those requirements were met." *Id.* at 173.

"The same procedures—including a hearing outside the presence of the jury and the entry of written findings—that apply to a general voluntariness challenge under Section 6, also apply to a challenge that is made to the sufficiency of warnings and voluntary waiver of the rights communicated by those warnings." *Id.* at 176. "As with Section 6, the trial judge's Section 7 jury instructions are 'general' ones that set out the pertinent law and legal requirements of Sections 2 and 3 (or, in an appropriate case, those of Article 15.17)." *Id.*

---

[4] Sections 2 and 3 of Article 38.22 address the admissibility of a written, oral, or sign language statement by the accused as a result of custodial interrogation. TEX. CODE CRIM. PROC. art. 38.22 §§ 2 & 3.

In other words, jury instructions related to confessions include "a general Article 38.22, § 6 voluntariness instruction" and a "general Article 38.22, § 7 warnings instruction (involving warnings given under § 2 and § 3)." *Id.* at 173 (internal quotation marks omitted). If a question is raised pursuant to Section 6 or the evidence raises a general voluntariness issue pursuant to Section 7, and the parties litigate the Sections 6 or 7 voluntariness issue, then the defendant should request a general voluntariness jury instruction because Sections 6 and 7 become law applicable to the case. *See id.* at 175–76.

If "'no reasonable jury could find that the facts, disputed or undisputed, rendered [a defendant] unable to make a voluntary statement,'" then a defendant is not entitled to an Article 38.22, section 6 voluntariness instruction. *Estrada v. State*, 313 S.W.3d 274, 300 (Tex. Crim. App. 2010) (quoting *Oursbourn*, 259 S.W.3d at 176). And if "the undisputed evidence shows that appellant was not in custody and was not entitled to be informed of these *Miranda* rights that the police nevertheless provided to him anyway and that the totality of the circumstances indicate that appellant knowingly waived," then a defendant is "not entitled to an Article 38.22, § 7 (validity of *Miranda* waiver) instruction." *Id.*

### 2. The Record

Here, the State concedes Day contested the voluntariness of his video-recorded statements during a pre-trial hearing, and the evidence shows he had been drinking that day. However, the State argues Day did not argue or suggest his statements were involuntary because of his intoxication and nothing in the video evidence suggested Day was intoxicated. We therefore turn to the trial court's decision as to whether Day's confession was voluntary, whether a party offered evidence suggesting it was not voluntary, and if such evidence was offered, whether Day was entitled to a voluntariness instruction. *See Oursbourn*, 259 S.W.3d at 175.

As we note above, the trial court denied Day's motion to suppress his video-recorded statements. The trial court found Sergeant Jones testified Day "did not have any problems walking to the vehicle," was not swaying or losing balance, and did not have trouble complying with instructions or communicating. The trial court further found Sergeant Jones told other deputies Day was highly intoxicated and smelled of alcohol. The trial court also made a finding indicating the body cam showed Day admitted he had been drinking. The trial court found Lieutenant Jones testified Day did not smell of alcohol during his questioning at the Sheriff's Office, was not swaying or losing his balance, and did not have other signs of intoxication. The trial court further found Lieutenant Jones testified Day had a "thick tongue" and admitted he had been drinking when asked if he was intoxicated. The video of Day's questioning at the Sheriff's Office showed Day denied being intoxicated at the time of the shooting, but he stated he was a "three out of ten" with a "little buzz." Finally, the trial court made a finding indicating a sample of blood taken from Day at 4:44 a.m.—nearly eight hours after Sergeant Jones's body cam began recording on scene—tested at .01 grams of alcohol per 100 milliliters of blood. Based on these findings, the trial court concluded that "to whatever extent the defendant may have been under the influence of alcohol, if he was at all, it did not render his statements or the waiver of rights involuntary or unknowing."

Both Day and the State offered evidence Day was intoxicated, including his video-recorded statements to Sergeant Jones while he was in handcuffs and his subsequent questioning by Lieutenant Craig Jones. Voluntariness therefore became law applicable to the case, and Day was entitled to a voluntariness instruction as to Sections 6 and 7. *Oursbourn*, 259 S.W.3d at 172–74 (quoting §§ 6 and 7 of Article 38.22).

### 3. Analysis

However, Day did not request these voluntariness instructions at trial, and we must therefore consider whether he was harmed by the trial court's failure to provide the voluntariness

instructions. "There are two different standards of review under which to assess harm depending on whether the defendant timely objected to the erroneous charge." *Lozano*, 636 S.W.3d at 29. "If there was a timely objection, the record need show only 'some harm.'" *Id.* (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). "If there was not a timely objection, the record must show 'egregious harm.'" *Id.* (quoting *Almanza*, 686 S.W.2d at 171).

Because Day did not request any voluntariness instruction, the record must show how he was egregiously harmed by the trial court's failure to provide the jury Article 38.22, Sections 6 and 7 instructions. *See Estrada*, 313 S.W.3d at 299. "Egregious harm is a difficult standard to meet." *Sandoval*, 665 S.W.3d at 528 (quoting *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016)). "To determine if the jury charge egregiously harmed the defendant, we examine the record as a whole, including the entire jury charge, the evidence, the contested issues, and the arguments of counsel, and anything else in the record that informs our analysis."[5] *Lozano*, 636 S.W.3d at 29. "Egregious harm exists if the error affects the very basis of the defendant's case, deprives him of a valuable right, or vitally affects a defensive theory." *Id.* To determine whether there was egregious harm, we consider the impact of the omission of the voluntariness instruction, not the impact of the admission of the statement itself. *See Oursbourn*, 259 S.W.3d at 182 n.89; *see, e.g.*, *Paz v. State*, 548 S.W.3d 778, 793 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd). For both the "some" harm standard and the "egregious" harm standard, "[t]he record must bear out that Appellant suffered actual harm, not theoretical harm, and neither party has burden to show harm." *Lozano*, 636 S.W.3d at 29; *see, e.g.*, *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

---

[5] While examining the evidence, appellate courts consider the "plausibility of the evidence" raising the issue. *See id.* (quoting *Villarreal v. State*, 453 S.W.3d 429, 436 (Tex. Crim. App. 2015)).

Here, examining the record as a whole, the jury charge did not include any reference to the voluntariness of Day's statements to police. Turning to the evidence and the contested issues, the State's case focused on Day's state of mind the day of the crime, the eyewitness account of the decedents' son, Day's statements to law enforcement, the forensic evidence, and the brutality of the crime. The evidence showed Day's neighbors owned horses that occasionally entered his property from his neighbors' property without permission by jumping over the fence between the properties. These actions occasionally damaged the fence, and this angered Day. The evidence also showed the day before the shooting, Day had begun drinking heavily and had to speak to law enforcement after his then-live-in girlfriend had tried to leave the house with their newborn baby.

The night of the shooting, B.H., the child of decedents, was at home with his parents and his older sister. His parents were in the backyard taking shooting practice, aiming at a rock formation on their property. After a short while, B.H. went inside, and around this time, Day called to B.H.'s parents to "come over." When B.H. returned outside, he saw his parents entering Day's property through the friendship gate between the properties. After they entered the property, Day shot them, shooting his dad first and then his mom. B.H. then called 911, and well into the twenty-minute call, B.H. and the 911 operator heard additional gunshots.

Sergeant Jones testified when he arrived on the scene, he went to where the bodies were located, and moments later Day arrived in his ATV. Day placed his hands in the air, and Sergeant Jones placed Day in handcuffs. Sergeant Jones observed blood splatter on Day's face, arms, and shirt. As Day explained to Sergeant Jones in his video-recorded statements by body cam, he was on his property when he was fired upon by his neighbors, and he returned fire killing his neighbors.

Sergeant Jones transported Day from the scene of the crime to the Sheriff's Office where he was interviewed by Lieutenant Jones. Lieutenant Jones *Mirandized* Day, with Day signing a *Miranda* warnings statement. Day's statements during the interview are like his recorded

statements on Sergeant Jones's body cam. Day explained the history with the neighbors' horses, and he also explained he had bullets from the neighbors in his front yard. He stated that that evening he was a "three out of ten" "buzzed" because he wanted to go to bed and had had a bad day. He stated he asked the neighbors to stop shooting, and the male neighbor responded "F U" and started shooting. Day returned fire, explaining he unloaded at least sixty rounds because he wanted to ensure the "threat was eliminated." He stated he was in fear for his life and was defending himself on his property.[6] Day then explained he did not know who was shooting on his property, and he asked them to identify themselves. They did not respond; he then saw the firearm's rifle scope laser activate and was fired upon by the trespassers before he returned fire. He stated he then secured the male decedent's AR-15. He explained he did not think it would have been the neighbors because of all his purple fence posts clearly marking his property as "no trespassing." Lieutenant Jones noted some evidence showed Day may have run over the decedents with his ATV, and asked Day, who denied doing any such thing intentionally.

Dr. Kendall Crowns, the deputy medical examiner for the Travis County Medical Examiner's Office testified he performed the autopsy on the decedents, and he concluded they died of homicide by multiple gunshot wounds. He further noted the evidence showed the female decedent had several bullet wounds showing she was shot at near point-blank range. Dr. Crowns also observed the Hollands both had blunt force injuries to the head, torso, and extremities. He further testified the female decedent's body and clothing had tire tread marks on them.[7] He also observed the female decedent had multiple sharp force injuries.

---

[6] He claimed he would have not much cared about the shooting if one of his cows had not been shot a few days earlier.

[7] This was disputed by defense expert, Dr. Robert Bux—a retired forensic pathologist.

The State offered a significant amount of forensic evidence. Law enforcement recovered from Day's ATV his damaged AR-15, a small shovel, and a T-post driver, each of which had blood on them. The AR-15 had a damaged stock and had several strands of hair on it. The female decedent's DNA was found on Day's AR-15, the T-post driver, the ATV's skid plate, and Day's t-shirt.[8] The male decedent's DNA was found on the shovel and the undercarriage of the ATV. Jesse Padilla, an investigator in the cold case unit of the Guadalupe County Sheriff's Office testified he searched Day's property with a metal detector four times and sent all the bullet casings he located for ballistics testing. He found no evidence the neighbors had been shooting on Day's property, but conceded that based on the ejection pattern of the casings from the male decedent's AR-15, it is possible casings from the male neighbor's shots might not be found on Day's property if the male neighbor was shooting at Day from his own property. He further testified he believed the bodies had been moved from their location based on the amount of brain matter and blood at a different location than where authorities found the bodies. Padilla also found additional ammunition in five magazines in the brush on Day's property near where the decedents were located, and underneath the male decedent. Holli Worden, a forensic scientist and firearm and toolmark examiner with the Bexar County Criminal Investigatory Laboratory, testified Day's AR-15 fired eighteen of the bullets submitted for testing and Day's .45 Colt fired the bullets submitted for testing along with it.[9]

The defense's case in chief involved recalling many of the State's witnesses, focusing on the propriety of police procedure at the scene of the crime, how dark it was at the time of the incident, and Day's statements he was acting in self-defense. Robert Murphy, the sergeant in

---

[8] Day's then-girlfriend testified that during a visit to prison Day wrote on his hand "66," "ran over with ATV," and "bashed with shovel," meaning he shot the neighbors sixty-six times, ran them over, and struck them with a shovel.

[9] An additional bullet was submitted for testing, but Worden could not reach any conclusion about it.

charge of the cold case unit of the Guadalupe County Sheriff's Office, testified the Sheriff's Office did not scan the decedents' property with a metal detector. Dr. Bux testified the autopsy results did not support the conclusion Day fired on the female decedent at near point-blank range or that Day ran her over with an ATV.

Turning to the arguments of counsel, the State contended the brutality of the crime, Day's state of mind, and the DNA evidence, refuted Day's claim of self-defense and defense of property. It further argued Day's story surrounding the crime evolved, and he sought to stage the scene. The State contended that on the night of the incident Day was drunk and angry because his girlfriend left him and took their baby with her.[10] The incident occurred when the neighbors were shooting on their own property, and Day called them over to his property and shot them. He fired additional rounds into the decedents several minutes into the 911 call and well after the initial shots. The evidence, according to the State, showed Day believed he could shoot anyone on his property because he had purple fence posts providing notice of "no trespassing" on his property. But, as the State contended, it was important to note there was no defense of property instruction. Day's story evolved from not knowing who was on his property before they started shooting at him to his neighbors were trespassing on his property and did not leave after he asked them to leave. Day entered the decedents' property to retrieve the decedents' AR-15, and he buried some magazines underneath the decedents. Day then struck the decedents with a series of blunt force items including the T-post driver, shovel, and AR-15, resulting in blood all over him. Day's closing emphasized it was undisputed he fired on decedents, but he argued he was acting in self-defense. Day feared for his life because it was dark, and he did not know who was on his property, and they fired upon him first. However, Day argued, the Sheriff's Office did not do a good job investigating

---

[10] The State contended, consistent with the jury charge, Day's intoxication was not a defense.

the crime. It did not search for bullet casings on the decedents' property, and it did not fingerprint anyone. The ammunition, according to Day, also came from the decedents' guns, not his own.

Here, mindful the egregious harm standard is difficult to meet, the evidence plainly shows Day was intoxicated. *See Sandoval*, 665 S.W.3d at 528 (quoting *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016)). But none of the jury charge, the evidence, the contested issues, the arguments of counsel, or anything else in the record purport to show the failure to instruct the jury as to the voluntariness of Day's statements based on his intoxication affected the very basis of Day's case, deprived him of a valuable right, or vitally affected a defensive theory. *See Lozano*, 636 S.W.3d at 29. Day's case instead, focused on the investigatory shortcomings of the Sheriff's Office and the circumstances surrounding the crime: Day heard someone on his property, it was dark out, they fired upon him, and he returned fire in self-defense. The omission of the voluntariness instruction could therefore not have had a significant impact. *See Oursbourn*, 259 S.W.3d at 182 n.89. Although the State raised Day's shifting account during his initial discussion while in custody and during the interview, the State's case largely focused on the significant, independent evidence of the crime. And most of Day's statements addressing his recollection of the incident were independently refuted by the State through other evidence including the eyewitness account, the DNA evidence, the ballistics evidence, Day's then-girlfriend, and law enforcement who were at the scene of the crime.

We therefore cannot conclude Day suffered actual, egregious harm, and his contention the trial court erred by failing to instruct the jury and to the voluntariness of his statements to law enforcement is overruled. *See id.* at 26.

## C. Defense of Property Instruction

Day argues there was evidence for a jury to find he was justified under Texas Penal Code § 9.42 to use deadly force to protect his property because he was protecting his land and his cows

from criminal mischief. Specifically, he contends the evidence presented at trial proved his neighbors had a history of shooting toward his property, firing wildly that night including firing shots at him, his cow was shot by a bullet recently, and he never consented to the neighbors shooting on his property or at his cows.

### 1. Law

"A defendant is entitled to an affirmative defensive instruction on every issue raised by the evidence regardless of whether it is strong, feeble, unimpeached, or contradicted, and even if the trial court is of the opinion that the testimony is not entitled to belief." *Williams v. State*, 630 S.W.2d 640, 643 (Tex. Crim. App. 1982) (quoting *Warren v. State*, 565 S.W.2d 931, 933–34 (Tex. Crim. App. [Panel Op.] 1978)). However, "[a] defendant will only be entitled to a defensive issue if there is some evidence of each element of a defense to support a rational inference that the element is true." *Gonzales v. State*, 680 S.W.3d 358, 385 (Tex. App.—Eastland 2023, pet. ref'd). In our review of whether the trial court erred in refusing to submit a requested defensive instruction, we must examine the evidence offered on the defensive issue in the light most favorable to the defense. *See, e.g.*, *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020); *Young v. State*, 542 S.W.3d 830, 838 (Tex. App.—Amarillo 2018, pet. ref'd).

Texas Penal Code Section 9.41 provides a person lawfully possessing land "or tangible, movable property is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to prevent or terminate the other's trespass on the land or unlawful interference with the property." TEX. PEN. CODE § 9.41. A person is justified in using deadly force to protect their land (1) if the person is justified in using force pursuant to Section 9.41; "(2) when and to the degree he reasonably believes the deadly force is immediately necessary . . . to prevent the other's imminent commission of arson, burglary, robbery, aggravated robbery, theft during the nighttime, or criminal mischief during the

nighttime;" and (3) the person "reasonably believes" "(A) land or property cannot be protected or recovered by any other means; or (B) the use of force other than deadly force to protect or recover the land or property would expose the actor or another to a substantial risk of death or serious bodily injury." TEX. PEN. CODE § 9.42. In other words, if any of the elements of Section 9.41 do not exist, then a person claiming defense of property is not entitled to an instruction pursuant to Section 9.41 *or* 9.42. *See id.* A person commits "criminal mischief" "if, without the effective consent of the owner" the person "intentionally or knowingly" (1) "damages or destroys the tangible property of the owner," (2) "tampers with the tangible property of the owner and causes pecuniary loss or substantial inconvenience to the owner or a third person" or (3) "makes markings, including inscriptions, slogans, drawings, or paintings, on the tangible property of the owner." TEX. PEN. CODE § 28.03.

### 2. Analysis

To support his contention, Day points to the evidence showing the neighbors shot at him, while he protected his land and his cows. However, for a party to be entitled to an instruction of defense of property, there must be some evidence of each element of the defense. *See Gonzales*, 680 S.W.3d at 383; *see also* TEX. PEN. CODE § 9.41, 9.42. In other words, some evidence must show Day's use of deadly force was immediately necessary to prevent or terminate the neighbors' trespass on his land or unlawful interference with his property, Day reasonably believed the deadly force was immediately necessary to prevent the imminent commission of criminal mischief, and Day reasonably believed (1) his property could not be protected by any other means or (2) the use of force other than deadly force to protect his land would otherwise expose him to a substantial risk of death or serious bodily injury. *See* TEX. PEN. CODE §§ 9.41, 9.42 & 28.03.

Here, Day plainly stated he asked the neighbors to identify themselves, and the male neighbor responded with an expletive and fired upon him. Crediting Day's statements, they support

an instruction on self-defense, which Day received. They do not support his contention force was immediately necessary to prevent or terminate a trespass on his land to prevent criminal mischief. Furthermore, Day's disproportionate use of force—firing sixty-six rounds at decedents with two separate firearms, attacking the female decedent with the AR-15 and the T-post driver, attacking the male decedent with the shovel, and driving over both decedents with the ATV—precluded any conclusion Day's use of force against the decedents was justified to prevent or effectuate the termination of any trespass on his land or unlawful interference with his property. *See Gonzales*, 680 S.W.3d at 384–86 ("If Appellant shot the firearm—fourteen times—to prevent or terminate Bernard's trespass on the land or his unlawful interference with the property, Appellant used a disproportionate degree of force to effectuate the prevention or termination of the trespass, which precludes a justification defense under Section 9.41 and, as a result, a defense under Section 9.42.").

Moreover, under Section 9.42, Day was required to believe criminal mischief was imminent. *See* Tex. Pen. Code §§ 9.42 & 28.03. But there was no evidence the neighbors were a threat for criminal mischief against Day's cows when Day fired upon the decedents. *See* Tex. Penal Code §§ 9.42, 28.03. Day never identified any threat to his cows that night, never identified the neighbors as perpetrating any threat to his cows, and never made any mention of the cows in proximity to where the shooting occurred on his property. Day also does not identify any other tangible property being targeted for criminal mischief. Indeed, to the extent the threat of criminal mischief against his cows was the motivating factor in Day's belief, the threat had passed. *See Gonzales*, 680 S.W.3d at 385 ("That is, even if Bernard had intended to throw the brick at the property gate rather than Bernie, the testimony indicated that the threat of damage to Appellant's property had passed after the brick was thrown.").

Accordingly, we cannot conclude the trial court erred by denying Day's requested instruction on Sections 9.41 and 9.42, and there is no evidence in the record to support a reasonable belief Day's use of deadly force was immediately necessary to protect the property from imminent criminal mischief. *See* TEX. PENAL CODE §§ 9.41–9.42; *Gonzales*, 680 S.W.3d at 386 (citing cases).[11]

## CONCLUSION

The judgment is affirmed.[12]

Luz Elena D. Chapa, Justice

PUBLISH

---

[11] Appellant further contends the "synergistic effect" of the trial court's errors constituted "cumulative multifarious" error, requiring reversal. Appellant cites no authorities or parts of the record in support of his contention. *See* TEX. R. APP. P. 28.1(i). Even if he had, because we do not conclude the trial court erred as to any of the points of error raised by Day, we cannot conclude any purported error constitutes cumulative multifarious error.

[12] On January 24, 2024, Day filed a pro se motion to amend the bill of costs. However, Day is represented by counsel and he is not entitled to hybrid representation. *See Scheanette v. State*, 144 S.W.3d 503, 505 n.2 (Tex. Crim. App. 2004) (appellant does not have right to hybrid representation on appeal). We therefore decline to address the pro se motion.